Filed 8/23/17

**CERTIFED FOR PUBLICAITON**


IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| THE PEOPLE, | B277631 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA067023) |
| v. | |
| HERIBERTO DEJESUS ROMERO, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Christopher G. Estes, Judge. Reversed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising

Deputy Attorney General, and Kathy S. Pomerantz, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Heriberto Dejesus Romero of assault with intent to commit rape, attempted kidnapping to commit rape, assault with intent to commit rape, false imprisonment by violence, and dissuading a witness from reporting a crime. Romero appeals based on several claims. Finding merit in one claim, we reverse.

## BACKGROUND

### A.    Overview of Charges

In a nine-count information filed by the Los Angeles County District Attorney on January 12, 2016, Romero was charged with sexually assaulting two women: Brittney P. and Marissa G. With respect to Brittney P., Romero was charged with assault with intent to commit rape (Pen. Code, § 220, subd. (a)(1); count 1.)[1] Romero was also charged with attempted forcible rape (§§ 664, 261, subd. (a)(2); count 2); attempted kidnapping to commit rape (§§ 664, 209, subd. (b)(1); count 3); false imprisonment by violence (§ 236; count 4); and dissuading a witness from testifying (§ 136.1, subd. (a)(1); count 9.) With respect to Marissa G., Romero was charged with kidnapping to commit rape (§ 209, subd. (b)(1); count 5); assault with intent to commit rape (§ 220, subd. (a)(1); count 6); attempted forcible rape (§§ 664,

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

261, subd. (a)(2); count 7); and false imprisonment by violence (§ 236; count 8).

The trial court later dismissed count 5 pursuant to section 995. Count 9 was subsequently amended to conform to proof, charging Romero with violating section 136.1, subdivision (b)(1) rather than subdivision (a)(1). The trial court also dismissed counts 2, 4, and 7 pursuant to section 1385. After a jury found Romero guilty as charged,[2] the trial court sentenced Romero to a total term of 23 years in state prison.

## B. Prosecution Evidence for Counts 1, 3 and 9

On January 17, 2015, at 9:00 p.m., Brittney P. jogged on the track at Pelona Vista Park in Palmdale. She had parked her car in the nearby parking lot. When she arrived at the park, there were no other cars in the lot and no one else was at the track. Brittney wore jogging pants, a shirt, jacket, and gloves. She had her cell phone with her.

After she had run for about 15 minutes, Brittney saw Romero looking down on the track from the parking lot. She continued running. At some point, Romero began running

---

[2] The charges remaining after the 995 motion, 1385 motion, and amendment were as follows: assault with intent to commit rape (§ 220, subd. (a)(1); count 1); attempted kidnapping to commit rape (§§ 664, 209, subd. (b)(1); count 3); assault with intent to commit rape (§ 220, subd. (a)(1); count 6); false imprisonment by violence (§ 236; count 8); and dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 9).

on the track.  He wore black sweatpants and a sweatshirt. Romero ran up behind Brittney and put his hand over her mouth.  She bit him, and they both fell to the ground. Brittney stood up and began to walk away.  Romero said he was sorry, and indicated that he thought Brittney was someone else.  Brittney said she was going to leave.  In English, Romero told Brittney that he wanted to tell her something and told her to come closer.  Brittney did not comply.  She started to walk away sideways.  Romero ran in front of Brittney.  She felt her life was in danger.  Romero told Brittney to go to the "dark area" of the park, which was about 30 feet away.  She refused, and Romero told her he had a knife.  He then grabbed at his pants pocket as if he was holding a knife.

Romero threw Brittney to the ground and got on top of her.  He thrust his pelvis into her body.  She screamed and told him to stop.  Brittney tried to wiggle her body from underneath Romero.  He unzipped her jacket and grabbed her breasts over her shirt.  He also kissed Brittney's neck. She continued to struggle with Romero and tried to get him off of her.  At some point, Brittney removed her gloves and scratched Romero on the back of his neck.  Romero began to pull down Brittney's pants and tried to spread open her legs. Brittney attempted to use her cell phone to call for help three or four times, but the phone repeatedly froze.  Romero took the phone from Brittney and threw it about six feet away.

4

Romero pulled Brittney's pants down to the middle of her thighs. She screamed louder. Romero told Brittney to "shut up" in English but called her a "stupid bitch" in Spanish. He looked up at the parking lot as though he had heard something. Brittney was then able to pull up her pants, pick up her cell phone, and run to her car. Romero walked away in a different direction from Brittney. When Brittney reached her car, she noticed a red Chevy pickup truck in the parking lot. She took a partial picture of the truck's license plate, which read "A8425."

Brittney drove to her friend's house and then went to the police to report the incident. She could not describe her attacker to the police because it had been dark outside. Brittney then went to the hospital where a forensic nurse performed a sexual assault exam. Brittney also spoke with a detective at the hospital and said her attacker was five feet eight inches, and had brown eyes and thin lips. The evidence collected during the sexual assault exam was analyzed for DNA. Romero was a major contributor of the DNA obtained from Brittney's neck where Romero had kissed her.[3] He was also a contributor of the DNA obtained from Brittney's cheek.[4]

---

[3] As to this sample, the probability of someone having the same DNA as Romero was one in 4.78 quintillion.

[4] As to this sample, the probability of someone having the same DNA as Romero was one in 3.83 billion.

## C.     Prosecution Evidence for Counts 6 and 8

On September 15, 2015, around 5:30 p.m., Marissa G. ran on a dirt trail near the aqueduct in Lancaster.  She wore running shorts and a long-sleeve workout top.  Romero jumped in front of her from a shrub.  His pants were lowered and his erect penis was exposed.  He wore a short-sleeve bright aqua blue T-shirt and blue jeans.  The color of the T-shirt resembled the color of a San Jose Shark's jersey.  The T-shirt also had black stains resembling oil all over it.

Romero grabbed Marissa by her shoulders and threw her onto the ground.  He got on top of her; she could feel his penis.  Marissa screamed and tried to free her arms.  Romero used his left hand to grab Marissa's breast under her shirt, and used his right hand to attempt to pull down her shorts.  Marissa hit Romero on his nose with a closed fist.

After Marissa hit Romero, he backed off and ran away.  Marissa reported the incident to the police the next day.  She described her attacker to a sketch artist, and viewed a photographic line up.  Marissa could not identify her attacker from the photos.  About a week after the incident, however, Marissa viewed  another photo six-pack, and picked Romero's photo "in less than ten seconds," according to the detective investigating the case.

Based on the partial license plate number provided by Brittney, the detective obtained the residential address of the pickup truck's registered owner.  The police searched the residence and found two aqua-blue-colored shirts in one of the bedrooms.  One of the shirts, which was found in a

6

hamper, was a Sharks' jersey with dark-colored stains on it. In that same bedroom, the police also found Romero's California driver's license as well as a DMV registration for a Chevy with license plate number 7A84257. Romero's name was on the registration. Romero did not present any witnesses at trial and did not testify on his own behalf.

**D.    Juror No. 7**

During a break that took place after Marissa had started her testimony, Juror No. 7 told the trial court that Marissa may have been a student of hers. The trial court addressed the issue after the lunch break but before trial resumed. With the prosecution and defense counsel present and outside the presence of the other jurors, the trial court questioned Juror No. 7. She said she was a high school teacher and that she was "very sure" Marissa had been a student of hers about three years earlier. The trial court noted that it was not unusual for jurors to have had prior contact with witnesses in this particular community. The following exchange then occurred:

The Court: Marissa has testified now, and you've heard what your—we've discussed during jury selection, your obligation is to be fair and impartial to both sides. That you cannot prejudge the case one way or the other based on anything outside of the evidence that you heard in the four corners of the courtroom. Anything about your contact with Marissa, her being a student of yours a few years ago, do you think is going to affect your ability to be fair and impartial to both sides?

7

Juror No. 7:  Not really.  She was a good student.  I remember positives.  But I still think I can be fair.

The Court:  Okay.  So nothing—the positives were positives that—when she followed through with whatever her obligations were as a student, but anything about those contacts with her is going to cause you to favor her testimony or to prejudge this case in any way?

Juror No. 7:  I don't think so.

Romero's attorney argued that Juror No. 7 should be removed because the defense theory was that this was a case of mistaken identity.  "[I]f this juror's prior experience with the witness was that she is diligent, follows through," defense counsel continued, "there's a good possibility she might rely on her past experiences in assessing whether or not Marissa was wrong in this particular case, which would, obviously, undermine the juror's fact-finding function."  The prosecutor responded that Juror No. 7 said she could put her relationship with Marissa aside, and that based on that, "there's nothing that would indicate that she would not follow through with her obligation, considering that she did follow the court's instruction to notify the court right away."

The trial court concluded:  "The Court did make the inquiry of Number 7 and brought the issue up in several different ways: ultimately, would her contact and prior relationship with Marissa affect her ability to be fair and impartial?  She indicated that she did not believe it would. The Court will accept her word in that regard."

8

## DISCUSSION

Romero contends that the trial court committed federal constitutional error by failing to remove Juror No. 7 when good cause existed to do so. We agree.[5]

Either party may challenge an individual juror for "an actual bias." (Code Civ. Proc., § 227, subd. (d).) "Actual bias" in this context is defined as "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party."[6] (Code Civ. Proc., § 225,

---

[5] Because we agree, we need not reach Romero's other claims on appeal which challenge his convictions for the attempted kidnapping of Brittney as well his section 136.1, subdivision (b)(1), conviction. We do note, however, that sufficient evidence supported both convictions. Further, although all agree that the abstract of judgment incorrectly states Romero was convicted of dissuading a witness from testifying—rather than dissuading a witness from reporting a crime—our reversal renders that error moot.

[6] In general, what constitutes "actual bias" of a juror varies according to the circumstances of the case. (*In re Carpenter* (1995) 9 Cal.4th 634, 653–654.) In assessing whether a juror is "impartial" for federal constitutional purposes, the United States Supreme Court has stated: "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." (*United States v. Wood* (1936) 299

subd. (b)(1)(C); *People v. Wheeler* (1978) 22 Cal.3d 258, 273–274.) A sitting juror's actual bias that would have supported a challenge for cause also renders the juror unable to perform his or her duties and thus subject to discharge. (*People v. Keenan* (1988) 46 Cal.3d 478, 532.)

A trial court's authority to discharge a juror is granted by section 1089, which provides: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." An inquiry sufficient to determine the facts is required whenever a trial court is put on notice that good cause to discharge a juror may exist. (*People v. Burgener* (1986) 41 Cal.3d 505, 520–521.)

Both the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court. (*People v. Bradford*

---

U.S. 123, 145–146.) " 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' [Citation.] [¶] It is not required, however, that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (*Irvin v. Dowd* (1961) 366 U.S. 717, 722–723.)

10

(1997) 15 Cal.4th 1229, 1348.)  Consequently, "[w]e review
for abuse of discretion the trial court's determination to
discharge a juror and order an alternate to serve.  [Citation.]
If there is any substantial evidence supporting the trial
court's ruling, we will uphold it.  [Citation.]  We have also
stated, however, that a juror's inability to perform as a juror
must ' "appear in the record as a demonstrable reality." ' "
(*People v. Marshall* (1996) 13 Cal.4th 799, 843.)  Moreover,
"a trial judge who observes and speaks with a . . . juror and
hears that person's responses (noting, among other things,
the person's tone of voice, apparent level of confidence, and
demeanor), gleans valuable information that simply does not
appear on the record." (*People v. Stewart* (2004) 33 Cal.4th
425, 451; see *People v. Cowan* (2010) 50 Cal.4th 401, 437.)

Nevertheless, a court abuses its discretion when its
ruling "falls outside the bounds of reason." (*People v.
DeSantis* (1992) 2 Cal.4th 1198, 1226.)  This is just such a
case.  At the outset, we note that neither Romero nor the
Attorney General cite a case factually similar to this one:
specifically, where a trial court allowed a juror to remain on
the panel after learning the juror was personally acquainted
with the victim herself to the depth and degree made
manifest by the existence of a teacher-student relationship
from which, even three years later, the teacher continued to
have positive memories and impressions.[7]  We also found no

---

[7] By way of comparison, the circumstances where
courts of appeal have upheld a juror's retention after
disclosure of some connection to a potential witness, do not

11

case matching this fact pattern in California jurisprudence: this is likely because in a situation such as this, where the juror clearly knew the victim, apparently had frequent personal interaction with the victim in an academic environment (which is customary in a teacher-student relationship) and admitted a favorable impression of the victim, it would have been axiomatic for the court to excuse

---

come close to the type of personal relationship that exists between a high school teacher and her student. In *People v. Maciel* (2013) 57 Cal.4th 482, 543, following opening statements, a juror informed the court that he worked in general maintenance at the central jail and knew of two deputies who would be testifying at trial. (One deputy was to testify about an attack by the defendant on another inmate in jail, the other was to testify about the defendant's possession of shanks in jail.) The juror said that he did not " 'really know'" the deputies, " 'but they work the same shift as me.' " He had never seen either deputy outside of work, or socialized with either one of them, but said, " 'I have had lunch with them in the same cafeteria.' " In *People v. Rangel* (2016) 62 Cal.4th 1192, 1210–1211, a juror reported an acquaintance with the victim's brother—a likely witness during the penalty phase of the trial. (The witness taught an aerobics class the juror had attended a few times.) In *People v. McPeters*, (1992) 2 Cal.4th 1148, 1174–1175, a juror was acquainted with the victim's husband—a likely trial witness—due to a recent business transaction. (The juror was in the process of buying a house and the witness was the seller's real estate agent.) In all three instances, the trial court was found to have acted within its discretion in declining to discharge the juror.

12

and replace that juror.[8]  Doing so would have eliminated any potential concerns regarding the juror's impartiality and precluded the issue from becoming a claim on appeal. Almost certainly, if, at the time of jury selection, the court had known that Juror No. 7 had been Marissa's high school teacher, the court would have excused Juror No. 7 from that case.  The same standard that almost every court would have exercised at the beginning of trial should have guided this trial court in the midst of trial, at the time of Juror No. 7's disclosure.

Thus, we conclude that under these facts, the court abused its discretion in refusing to discharge Juror No. 7. Critically, it does not appear that the court looked beyond Juror No. 7's statement that she did not "think" her favorable teacher-student relationship with Marissa would affect how she perceived the evidence and participated in deliberations.  Therefore, we are not confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.  (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052–1053.)  As with any teacher-student relationship, Juror No. 7's contact with Marissa was relatively sustained—presumably lasting at least the length

---

[8] We note that the trial court failed to ask Juror No. 7 about these relevant details, including how long the juror had taught Marissa, how many days a week she saw Marissa during that time, the depth of interaction between the juror and Marissa when in class together, and whether she saw Marissa outside the context of this relationship.

13

of an academic term if not an entire school year or longer. That, years later, Juror No. 7 remembered this particular student and could recall both her performance and disposition speaks to the level and depth of the relationship. Juror No. 7's favorable impression of her former student was especially critical given that the counts involving Marissa relied on Marissa's credibility and ability to recall the details of the crime. Although Brittney's assault yielded DNA evidence that Romero could not reasonably contest, Marissa's case was not so supported, relying exclusively on witness identification rather than forensics.

Consequently, we hold the trial court should have sustained Romero's challenge regarding Juror No. 7. Having found federal constitutional error, we must decide if it requires reversal of Romero's convictions. Most federal constitutional violations are subject to harmless error review under *Chapman v. California* (1967) 386 U.S. 18. (*Washington v. Recuenco* (2006) 548 U.S. 212, 218.) Not so for those federal constitutional errors deemed "structural," which require automatic reversal without a demonstration of harm to the defendant. (*Ibid.*) By their very nature, structural errors render a trial fundamentally unfair or an unreliable determinant of a defendant's guilt or innocence. (*Neder v. United States* (1999) 527 U.S. 1, 8–9.) For an error to be structural, it must affect the entire "framework within which the trial proceeds." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310.)

14

Denial of the right to an unbiased jury is one such error.  (*People v. Nesler* (1997) 16 Cal.4th 561, 579.)  Romero was entitled to be tried by 12, not 11, impartial and unprejudiced jurors.  "Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." (*People v. Pierce* (1979) 24 Cal.3d 199, 208.)  Therefore, "we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard." (*Nesler*, at p. 579.)  Although Romero argues that the trial court's error requires reversal of his convictions in counts 6 and 8 only, when, as here, an error has affected the entire trial framework, we cannot parse relief in this manner.  When structural error has been found, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, [citation] and no criminal punishment may be regarded as fundamentally fair."[9]  (*Rose v. Clark* (1986) 478 U.S. 570, 577–578.)

---

[9] However, there is no double jeopardy bar to retrial of the case.  (*People v. Hernandez* (2003) 30 Cal.4th 1, 6.)

**DISPOSITION**

The judgment is reversed.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.

16