Filed 2/24/23  P. v. Dunlap CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM DUNLAP,<br><br>    Defendant and Appellant. | D079103<br><br>(Super. Ct. No. SCN400765) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed in part, reversed in part, and remanded.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Paige B. Hazard and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

William Dunlap appeals from the final judgment entered after a jury found him guilty of assault likely to cause great bodily injury, misdemeanor assault, and two counts of misdemeanor battery.  The jury also found that

Dunlap personally inflicted great bodily injury in the commission of the assault likely to cause great bodily injury. Dunlap contends that reversal of his convictions is warranted on several grounds: (1) defense counsel violated his Sixth Amendment right to determine the objective of his defense by conceding his guilt to certain offenses against his wishes; (2) the prosecutor made inflammatory and false statements during closing arguments that constitute reversible error; and (3) the trial court committed prejudicial error when it denied Dunlap's motion for a new trial. He also argues that his misdemeanor assault conviction should be reversed because it is a necessarily included offense of assault likely to cause great bodily injury, his case should be remanded for resentencing based on recently enacted legislation, and the abstract of judgment must be corrected because it reflects fines and fees the trial court agreed not to impose.

We find that Dunlap's first three contentions are without merit, but we agree with him as to the remaining arguments. We thus accept the People's concessions regarding the reversal of the misdemeanor assault conviction, the request for remand for resentencing, and the correction to the abstract of judgment. Accordingly, we vacate his misdemeanor assault conviction, remand for resentencing, and otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution's Case*

In May 2019, security officers Fernando A. and Howard B. were working the dayshift at Palomar Medical Center when they were called to assist the nursing staff with medicating Dunlap, who was a patient in the emergency department there. One of the doctors had examined Dunlap that morning and instructed nurses to administer a sedative via injection. Due to

2

Dunlap's agitated condition, the nurses requested the assistance of hospital security officers before going into his room.

Fernando and Howard, along with two other security officers, reported to assist the nurses. Fernando testified that when he and the other officers arrived outside Dunlap's room, he could see Dunlap pacing and throwing pillows and blankets around the room. The nurses and the security officers entered the room and asked Dunlap to lie down on the bed. Dunlap complied, the officers secured his limbs, and the nurses administered the injections. After the injections, the nurses and the officers left Dunlap's room, and the officers waited outside of the room to ensure Dunlap remained calm.

Shortly after the officers left Dunlap's room, he wrapped his hand in a blanket and punched the sliding door twice. Dunlap appeared angry and was clenching his fists. Howard opened the sliding door and tried to calm Dunlap down by talking to him. The second time Howard began speaking to Dunlap, Dunlap punched Howard in the face with a closed fist.

Fernando grabbed Dunlap by the shoulders and pushed him toward the bed. Both men fell onto the bed, with Fernando landing on top of Dunlap. Dunlap then bit Fernando's nose and began tugging and pulling it with his teeth. Fernando testified that his entire nose was in Dunlap's mouth, and he felt as though a knife was going through his nose. Fernando feared he was going to lose his nose.

Dunlap also wrapped his right hand around Fernando's neck, attempting to choke him. Fernando struggled to breathe and feared he was going to die. One of the nurses who witnessed the incident heard Fernando repeatedly say he could not breathe. After about ten seconds, the other security officers were able to pull Dunlap off Fernando.

3

When Fernando stood up, he lost his sight for a couple of seconds, felt very dizzy, and struggled to breathe. There was blood all over his clothes and the floor. Howard testified that when he saw Fernando walking out of Dunlap's room, Fernando's nose was "basically black" and there was blood pouring from his nose. Fernando placed his pain level immediately after the incident at a 10 out of 10.

Once Fernando was out of the room, the nursing staff gave him oxygen and took him to another room for treatment. He was given morphine and other medication intravenously and received six stiches for the injury to his nose.

Escondido Police Officer Craig Bond responded to the scene of the incident. He interviewed Fernando, who had a "very significant injury to his nose." The officer saw a bite mark around three quarters of Fernando's nose and dark purple coloring on the tip of his nose, an abrasion above his right eye, a bruise on his forehead, and blood on his clothes. Officer Bond also interviewed two of the nurses who witnessed the incident, and he later spoke with Howard by phone.

Dunlap was arrested and taken from the exam room outside on a hospital gurney. He followed commands to get off the gurney and into a patrol car. He was conscious, seemed coherent, appeared to have no trouble walking or standing, and was cooperative with officers.

The prosecution introduced photo exhibits depicting Fernando's injuries and the blood on his clothing after the incident. The photographs show a bloody bite mark around most of Fernando's nose, and the bottom portion of his nose appears dark reddish purple. The photographs also show a laceration and a bruise on Fernando's forehead.

4

Fernando testified that his nose was swollen, bruised, and a purple and blue color for about a week after the incident. He also suffered daily headaches for two to three weeks. He was out of work for ten days and placed on light duty for three additional days. Fernando now has a visible scar and a bump on his nose as a result of the injury.

The prosecution also introduced a photo exhibit of Howard's injury. Howard testified that he had some bruising and redness on his cheek from Dunlap's punch, and his cheek was sore the day after the incident. Howard stated that while he would likely forget that he was punched, he would probably never forget the incident because of the nature of the injury to Fernando's nose and the image of the end of his nose "completely blackened."

B. *Defense Case*

Fernando testified on cross-examination that the entire incident took place in less than two minutes. The physician notes from the day of the incident state that Fernando reported only "moderate nasal pain," but Fernando disagreed with that characterization during trial, testifying that he had told medical staff his pain was "severe." Although Fernando had difficulty breathing during the incident, he was able to breathe and could yell at the beginning.

Fernando agreed that his nose healed well, with no complications, in less than three weeks. He later told his doctor he felt irritation in his nose, but his doctor told him everything was normal and he did not need any additional medical treatment. Fernando did not lose consciousness or have memory loss during or after the incident. As of Fernando's follow-up appointment 20 days after the incident, his neck pain and nose pain were completely gone except for some irritation to his nose, and he was no longer

experiencing dizziness.  At that time, his headaches were intermittent, and he placed his pain level at a two out of 10.

Howard testified that he did not recall many of the details of the incident because it happened almost two years before trial.  Howard recalled that Dunlap was upset about receiving the initial shots from the nurses.  He agreed that patients are allowed to get out of bed, pace inside the room, talk, and be frustrated.  Aside from punching the door, Howard did not see Dunlap attempt to break anything or attempt to hurt others or himself before the security officers entered Dunlap's room the second time.

Howard's injury from Dunlap's punch was minor and did not require any medical treatment.  His cheek was slightly red and sore after the incident and healed within a week.

Dunlap testified in his own defense.  He had checked himself into Palomar Medical Center for medical assistance the day before the incident.  That day, the medical staff treated him well; they listened, were compassionate, and seemed receptive when he explained his restrictions, necessities, and medical history.  Based on Dunlap's conversations with medical staff, he expected to receive a specific procedure while at the hospital.

The day of the incident, a doctor whom Dunlap had never met entered the room with two medical assistants.  The doctor informed Dunlap they would be proceeding with an alternate treatment than the one Dunlap had requested.  Dunlap explained that the doctor's proposed approach conflicted with Dunlap's allergies, but the doctor was not receptive.  One of the doctor's assistants agreed with Dunlap, but the doctor ordered the two assistants to leave and then told Dunlap that he could and would give Dunlap medication without his consent.  Dunlap was shocked and said, "now wait a minute," but

6

the doctor did not come back, and Dunlap never had another opportunity to express his concerns.

At that point, Dunlap was worried because the doctor did not explain anything about the medication he planned to administer, such as why it was necessary or what side effects could occur, and Dunlap has had issues with certain medications causing complications for him in the past. Dunlap felt anxious, so he thought it would be best to go somewhere else to calm down. He asked a nurse if he could go outside and have a cigarette. She said no and told Dunlap he was not allowed to leave but that they were finding a place for him. Dunlap returned to his room and went to sleep.

The next thing Dunlap remembers is waking to the sound of three security guards and two nurses coming into his room. One of the nurses told Dunlap they were going to give him a sedative because he had been disturbing his room. Dunlap denied disturbing anything. Immediately after that, a guard pushed him onto his bed and one of the nurses put an injection into each of his thighs. Dunlap voiced his opposition to the injections but did not physically resist.

Dunlap did not feel safe at that point and was internally "freaking out." He then heard one of the nurses laugh, which he described as a horrible sound, and he believed she was laughing at him. Dunlap lost his ability to control his reactions at that point, but he believed he needed to do something to exhaust himself as quickly as possible and make himself happy. To mimic the way he used to punch a punching bag at his grandma's house as a child, Dunlap held a sheet against the glass door and punched it multiple times. Dunlap said he was not trying to threaten or fight anyone.

The security guards then opened his door, looking angry and aggressive. After one security guard told Dunlap to "sit down" in an angry

7

tone, Dunlap punched him once in the face. Dunlap admitted that he was guilty of that offense.

Another security guard then came at Dunlap, at which point Dunlap believed he was in a "street fight." He grabbed the guard's shirt and pivoted him; the momentum of the guard and Dunlap's pushing took them to the bed. At that point, Dunlap was feeling "pure rage," and he bit the guard on his face. Dunlap voluntarily let go at the same time another guard was pulling him free, and he then fell to the floor.

Dunlap was still fighting at that point, but someone had grabbed his legs, and another guard jumped in the air and brought his knee down onto Dunlap's ribs two or three times. Dunlap's legs and arms were then restrained and attached to the hospital bed. He testified that he believed the injections administered to him were harmful because he has a deformity at the injection site, he developed a stutter, and his coherency has been foggy since the injections.

Doctor Charles O'Connell is an emergency medicine physician and medical toxicologist who testified as a defense expert. He reviewed the police report and Fernando's hospital records, CT scans, forensic reports, photographs, and X-rays.

Dr. O'Connell testified that, based on an independent review of the records and his own professional experience, he did not believe Fernando would suffer from any long-term dysfunction. Fernando's abrasions were "very, very superficial," his lacerations were simple, and he received few stitches, all of which were absorbable because the face often heals very quickly. Dr. O'Connell believed Fernando's nose injury was "[r]elatively superficial." In Dr. O'Connell's opinion, Fernando's injuries were minor, and

8

it is likely he would have had a good outcome even if the doctors had done nothing to treat him.

The defense also introduced two photo exhibits at trial that depicted Fernando's nose after it had healed.

C. *Conviction*

The jury found Dunlap guilty of one count of assault likely to cause great bodily injury upon Fernando (§ 245, subd. (a)(4));[1] one count of misdemeanor battery upon Howard (§ 242); and two lesser included offenses of battery with serious bodily injury (§ 243, subd. (d))—misdemeanor assault (§ 240) and misdemeanor battery (§ 242) upon Fernando. The jury also found true the allegation that Dunlap personally inflicted great bodily injury in the commission of the assault likely to cause great bodily injury upon Fernando. (§ 12022.7, subd. (a); § 1192.7, subd. (c)(8).) The jury found Dunlap not guilty of battery with serious bodily injury. (§ 243, subd. (d).)

D. *Motion for New Trial and Sentencing*

In May 2021, the trial court denied Dunlap's motion for a new trial and/or for modification of the verdict, which had previously been briefed by the parties. Defense counsel argued that the jury's verdicts were inconsistent, in part because the prosecution had improperly appealed to the sympathy of the jury during closing arguments. The prosecution responded that there was more than enough evidence to support the jury's finding that, based on the violent and unprovoked nature of the attack and Fernando's injuries, Dunlap personally inflicted great bodily injury upon Fernando.

The trial court concluded that jury's verdicts of guilty as to the great bodily injury allegation and not guilty as to the battery with serious bodily

---

[1]     All subsequent statutory references are to the Penal Code unless otherwise noted.

injury were not inconsistent because the jury instructions for the two offenses were different and contained different definitions. Because there was nothing inconsistent about the jury's findings, and based on the evidence presented, the court concluded there was no reason for it to set aside the verdicts.

After denying Dunlap's motion, the court sentenced him to a total term of six years of imprisonment. The court imposed the middle term of three years for violation of section 245, subdivision (a)(4) (assault on Fernando likely to cause great bodily injury), with a consecutive three-year term for the great bodily injury enhancement under section 12022.7, subdivision (a)); 180 days for the violation of section 240 (misdemeanor assault on Fernando), stayed pursuant to section 654; 180 days for the violation of section 242 (misdemeanor battery on Fernando), stayed pursuant to section 654; and 180 days for violation of section 242 (misdemeanor battery on Howard), to run concurrent to count one.

The court initially imposed a $6,300 restitution fine, a stayed $6,300 parole revocation fine, a $120 court security fee, a $90 criminal conviction assessment, and a $154 criminal justice administration fee. However, defense counsel asked the court not to impose the fines and fees based on Dunlap's inability to pay. The prosecutor did not object and the court granted defense counsel's request, stating it would not impose the fines and fees.

Dunlap timely filed a notice of appeal.

## DISCUSSION

### I

Dunlap first contends that defense counsel's concession of his guilt as to the lesser included offenses (LIOs) of count one (assault likely to cause great

bodily injury) and count two (battery with serious bodily injury) violated his Sixth Amendment right to determine the objective of his defense because Dunlap did not agree to concede his guilt as to these counts. Dunlap argues that defense counsel improperly told the jury he was guilty of the LIOs to counts one and two. According to Dunlap, he disagreed with his counsel's decision to concede his guilt as to these offenses, which he contends is sufficiently demonstrated by (1) his admission of guilt to count three, but not counts one and two, during his testimony at trial, (2) his decision to decline, on several occasions pre-trial, to plead guilty in exchange for plea deals under which he would have served no further time and admitted a non-violent offense, and (3) his statement to the trial court after closing argument that he agreed with defense counsel's concession of his guilt to the jury as to count three but not as to the LIOs to counts one and two.

The People respond that Dunlap's argument is without merit because (1) defense counsel argued that Dunlap acted in self-defense and asked the jury to acquit him on all charges, only presenting the LIOs as an alternative option should the jurors conclude Dunlap did not act in self-defense, and (2) Dunlap did not adamantly object to the admission of his guilt, and his testimony was consistent with defense counsel's strategy.

Although it is a close call, we agree with the People that based on the record before us, Dunlap has failed to demonstrate that he informed his counsel before closing arguments that he objected to her decision to concede guilt as to the LIOs. On this record, we cannot conclude that Dunlap's Sixth Amendment rights have been violated.

A. *Standard of Review*

The question of whether Dunlap's constitutional rights were violated is a legal question we review de novo. (*People v. Palmer* (2020) 49 Cal.App.5th

11

268, 280.) A defense counsel's decision to concede a defendant's guilt against their wishes is error that "defies harmlessness review." (*People v. Bloom* (2022) 12 Cal.5th 1008, 1042 (*Bloom*).) Because "[s]uch an admission blocks the defendant's right to make the fundamental choices about his own defense" and "the effects of the admission would be immeasurable," the error is reversible without any need to show prejudice. (*Ibid.*, citing *McCoy v. Louisiana* (2018) ___ U.S. ___ [138 S.Ct. 1500, 1511] (*McCoy*).)

B. *Dunlap Has Not Established a Violation of His Sixth Amendment Rights*

The Supreme Court has held that "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. . . . Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action." (*Florida v. Nixon* (2004) 543 U.S. 175, 187.) A defendant's right to determine the objective of his defense falls within this category. (*McCoy, supra,* 138 S.Ct. at p. 1507; *Bloom, supra,* 12 Cal.5th at p. 1036.) It is the "defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*McCoy,* at p. 1505.)

Dunlap contends that his objective as to counts one and two was to maintain his innocence, and counsel disregarded that objective when she made certain comments to the jury that he says conceded his guilt as to the LIOs of count one and count two. After first instructing the jurors that they must find Dunlap not guilty of all charges, including the LIOs, if the prosecution failed to prove he did not act in lawful self-defense, defense counsel then stated: "I would submit to you at the end of this case that as to

12

Count 1, he's not guilty. He's guilty of an LIO. [¶] Count 2. He's not guilty. He's guilty of an LIO."

Twice after this, defense counsel told the jurors that they could do the LIO analysis themselves. Regarding count one, counsel stated: "I would submit to you that he's not guilty of Count 1 because the assault with force likely to cause great bodily injury wasn't prove[n] to the standard required by the law. [¶] As to the LIO's, I'll submit to you. You can do that analysis." Regarding count two, she said: "You put not guilty on the -- on the verdict form and you go to the lesser included offense. [¶] I would submit to you as to Count 2 he's not guilty of that, and then you go to the LIO. I'm not going to talk about the LIO's. You guys can look at the elements of the LIO."

Near the end of her closing, defense counsel argued: "I would submit to you this case was overcharged. He's really guilty of batteries. That's what he's guilty of. The injuries suffered by [Fernando] were not serious impairment of a physical condition. They are not serious bodily injuries. They don't constitute great bodily injury, particularly under the allegation." She also reminded the jurors again that, to find Dunlap guilty of any offense, the prosecutor was required to prove Dunlap had not acted in self-defense. She concluded her argument by stating: "He's guilty of Count 3, and he may in fact be guilty of LIO's, the lesser offenses of Counts 1 and 2. That is the verdicts I'm asking you to return."

After closing arguments, the trial court questioned Dunlap and defense counsel regarding defense counsel's statements about the LIOs as follows: "THE COURT: All right. The other thing I need to know for the record that Mr. Dunlap agrees with the defense strategy of conceding guilt on Count 3; and that's correct? [¶] THE DEFENDANT: Yes. [¶] THE COURT: Okay. And then conceding guilt as to the lesser included offenses on Counts 1

13

and 2? [¶] THE DEFENDANT: I do not. [¶] THE COURT: You do not? [¶] THE DEFENDANT: No. [¶] THE COURT: So it appears that you indicated[, defense counsel], that he was guilty of the lesser included offenses of Counts 1 and 2? [¶] [DEFENSE COUNSEL]: Submitted that issue to the jury that they could conclude his guilt on those lesser charges, yes. [¶] THE COURT: All right. [¶] [DEFENSE COUNSEL]: That was essentially the nature of my argument is that he is absolutely not guilty as to the greaters and that they could consider he was guilty as to the lessers. [¶] THE COURT: All right. And, Mr. Dunlap, you heard your attorney say that? [¶] THE DEFENDANT: I did. [¶] THE COURT: All right. So I didn't hear from you that you disagree? [¶] THE DEFENDANT: I've been given instructions by you personally, you know, to remain silent and I was worried about the effect it would have if I did speak. [¶] THE COURT: Okay. All right. Well, that is noted that you don't agree with that strategy."[2]

Even assuming defense counsel's comments during closing argument constituted concessions of guilt, we conclude that Dunlap has not shown he made clear *to his counsel* before closing argument his intention to maintain innocence even as to the LIOs. California courts applying *McCoy* have consistently held that it applies only where the "defendant actively opposes counsel's concession" and makes that opposition known to his counsel. (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1056; *People v. Burns* (2019) 38

---

[2] On the first day of trial, the judge had instructed defendant not to speak directly to her: "You know what, Mr. Dunlap? Let's get something straight. You do not talk to me. You talk to your lawyer; you got that? You are represented by counsel. So don't do that again. Because if you do things contrary to what I'm telling you, I'm going to remove you from the courtroom, and we will continue the trial; you got it?" Defendant responded: "Please forgive me, Your Honor. My attorney -- I'm pretty much in the dark on all this even with Counsel, so . . . " The court replied: "All right. Well keep your comments to yourself and your lawyer."

14

Cal.App.5th 776, 784 ["*McCoy* is thus predicated on a client's express objection to defense counsel's concession strategy."]; *People v. Franks* (2019) 35 Cal.App.5th 883, 891 (*Franks*) ["[A] defendant must make his intention to maintain innocence clear *to his counsel*."].)  Similarly, the California Supreme Court recently found a Sixth Amendment violation where the defendant's counsel conceded his guilt in connection with two killings because the defendant had expressly objected to this approach during pretrial proceedings, stating to the court before trial:  " '[Defense counsel], *over my objection and against my express wishes, is going to concede guilt in this case* and I find that to be intolerable and outrageous.' " (*Bloom*, *supra*, 12 Cal.5th at p. 1040, italics added.)

Unlike in *McCoy*, where the defendant "vociferously insisted on his innocence and adamantly objected to any admission of guilt," or in *Bloom*, where the defendant repeatedly told his counsel and the court prior to trial that he did not wish to admit guilt, there is nothing in the record here demonstrating that Dunlap expressed an intransigent objection to his counsel's trial strategy before her closing argument.  (*McCoy*, *supra*, 138 S.Ct. at pp. 1503, 1510; *Bloom*, *supra*, 12 Cal.5th at pp. 1037, 1040.)  Neither Dunlap nor his counsel made any statement on the record before us indicating that Dunlap told his counsel he wished to maintain his innocence as to the LIOs.  Dunlap's statements to the trial court *after* closing argument do not demonstrate that he voiced his opposition to defense counsel's strategy *before* closing argument.

Dunlap cites to *People v. Eddy* in support of his argument that he was not required to object in court to his counsel's statements during closing argument to preserve his Sixth Amendment claim and argues he had good reason not to do so given the trial court's prior admonition.  (See *People v.*

15

*Eddy* (2019) 33 Cal.App.5th 472, 482 (*Eddy*).) We agree with him on both points, but they provide no support for his claim of error for the reason we have already explained. In *Eddy*, defense counsel admitted to the trial court that he *knew* his client wanted to present an innocence defense, but he determined that a concession of guilt to the LIO would obtain the best result for his client, so he ignored defendant's wishes. (*Ibid*.) The defendant also told the trial court that he had advised his counsel " 'not to go that route' " and admit his guilt, but counsel did it anyway. (*Ibid*.) Accordingly, the court found that the record established "that defendant instructed his counsel to maintain his innocence before the closing argument and that this instruction was not honored." (*Ibid*.)

Again, Dunlap here has provided us with no such evidence that he objected to his counsel's strategy before her closing argument, or that she disregarded his express opposition and conceded his guilt of the LIOs over his objection. It is possible this is what happened, but because the record is silent on this key point, we cannot find error. (See *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1166 ["The record in this case is more like *Florida v. Nixon* (2004) 543 U.S. 175, 189 . . . , which found no constitutional violation with a silent record on whether the defendant disagreed with his attorney's concession of guilt, and with the first complaint about the concession coming only after trial."].)

Contrary to Dunlap's contention, this case is more similar to *Franks*, where the court concluded the defendant's Sixth Amendment right had not been violated, than to *McCoy*, *Bloom*, or *Eddy*. (See *Franks*, *supra*, 35 Cal.App.5th at p. 891.) In *Franks*, the court found no Sixth Amendment violation where the defendant had denied guilt to police and expressed a general desire to help his lawyer "fight" the prosecution's evidence, but

16

nothing in the record indicated he had made clear to his counsel that the objective of his defense was to maintain innocence, "or that he voiced 'intransigent objection'—or any opposition—to his lawyer's defense strategy." (*Ibid.*)  The *Franks* court also took into consideration that defense counsel had repeatedly told the court that the defendant refused to speak with him about the case during their meetings, and the defendant regularly rejected his counsel's correspondence regarding the case and declined to attend trial. (*Ibid.*)

Similarly, nothing on which Dunlap bases his argument here involves direct statements to his counsel.  Instead, he relies on the fact that he declined on multiple occasions to plead guilty to lesser offenses, he informed the trial court after closing arguments that he did not agree with his counsel's strategy, and his counsel's responses to the trial court's inquiry did not indicate that Dunlap agreed with her strategy and instead suggested that she did not believe she had conceded Dunlap's guilt on the LIOs.  These facts are insufficient to show that Dunlap's plain objective was to maintain innocence and that he voiced intransigent objection to his counsel's strategy before she gave her closing argument.  Moreover, as in *Franks*, defense counsel here informed the court that she had attempted on multiple occasions to speak to Dunlap prior to trial, but he repeatedly declined to do so.

To be clear, we do not find that Dunlap *could not* demonstrate a *McCoy* error based on his counsel's statements during closing argument.  It is possible that he did expressly instruct his counsel to maintain his innocence or voiced objection to her intended concession of his guilt as to the LIOs.  But the appellate record is silent on this question.  If there is any evidence outside the record to support his claim, the appropriate remedy would be a petition for writ of habeas corpus "where such evidence can be presented."

17

(*People v. Arce* (2014) 226 Cal.App.4th 924, 930.)  Based on the record before us, we conclude that Dunlap has not demonstrated his Sixth Amendment rights were violated.

## II

Dunlap next contends that the prosecution made comments to the jury during trial that constituted prosecutorial error.  First, Dunlap argues that the prosecutor improperly appealed to jurors' emotions by referring to Dunlap's behavior as "scary," "personal," "excessive," and "violent."  He contends that these comments constitute inflammatory rhetoric that invited the jury to view the case through the victim's eyes.  The People counter that the prosecutor's comments were intended to refute Dunlap's self-defense claim and were therefore appropriate given the context in which they were made.

We agree with the People.  To establish reversible prosecutorial misconduct, Dunlap must show that the prosecutor either (1) "infect[ed] the trial with such unfairness as to render the subsequent conviction a denial of due process" or (b) used "deceptive or reprehensible methods" to persuade the jury and that it is reasonably probable defendant would have received a more favorable outcome absent the use of those methods.  (*People v. Navarro* (2021) 12 Cal.5th 285, 332.)  The prosecutor's use of the words "scary," "personal," "excessive," and "violent" to describe Dunlap's behavior did not constitute a deceptive or reprehensible method, nor did it infect the trial with unfairness.  These comments did not invite the jury to view the case through Fernando's eyes but rather were aimed at rebutting Dunlap's claim of self-defense.  The prosecutor used these words to support her argument that Dunlap unlawfully used more force than necessary under the circumstances and that he was motivated by "pure rage" (as he had testified) rather than fear when he bit

18

Fernando's nose and choked him. We thus conclude that the prosecutor's comments did not rise to the level of misconduct.

Dunlap also argues that the prosecutor misstated his testimony when she told the jury he had admitted to using more force than necessary. The People respond that although this assertion is arguably correct, Dunlap's subsequent testimony that he had used more force against Fernando than Fernando had used against him allowed the prosecutor to reasonably infer that Dunlap had admitted to using more force than necessary under the circumstances. According to the People, the prosecutor was permitted to share that inference during her closing argument.

Dunlap has the better argument. The prosecutor told the jury Dunlap had admitted the act of biting Fernando's face was "way more force than was necessary." This was not true. To the contrary, Dunlap expressly disagreed with the prosecutor when she attempted to get his concession on this point. The prosecutor did not merely share her inference with the jury; she misstated Dunlap's testimony. This constitutes prosecutorial error. (*People v. Hill* (1998) 17 Cal.4th 800, 823.) Whether the error was intentional or inadvertent is immaterial to our analysis. (*Id.* at p. 822.)

The error, however, did not prejudice Dunlap. The statement was "but a brief part of the argument" made by the prosecution (see *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 920), the court instructed the jurors to rely on their own recollection of the evidence after defense counsel objected, and the prosecutor then clarified that Dunlap's bite was "more force than the shove"—which Dunlap *had* admitted during his testimony. Moreover, we do not find it reasonably probable that this brief remark affected the verdicts in light of the evidence of Dunlap's guilt. (See *ibid.*) We therefore conclude that the error was harmless.

19

III

Dunlap also contends that the trial court erred in denying his motion for a new trial because it (1) failed to independently review the evidence in deciding the motion and (2) abused its discretion in denying the motion on the merits. The People agree with Dunlap that the court applied the wrong standard to his motion for a new trial but argue that any error was harmless. We do not agree with the parties that the court applied the wrong standard in ruling on the motion for a new trial, and we are not persuaded by Dunlap's argument that the court abused its discretion in denying the motion on the merits. We therefore find no error.

A. *Standard of Review*

We review the trial court's denial of Dunlap's motion for a new trial for abuse of discretion. A trial court has broad discretion in determining whether a request for a new trial should be granted, and there exists a strong presumption that the court properly exercised its discretion. (*People v. Davis* (1995) 10 Cal.4th 463, 524 (*Davis*).) As the Supreme Court has explained, the ruling on a "motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Ibid.*, internal quotation marks omitted.)

B. *The Trial Court Did Not Err in Denying Dunlap's Motion for a New Trial*

Section 1181, subdivision (6), permits a defendant to move for a new trial on the ground that the verdict is contrary to the law or evidence. In deciding the motion, "the trial court's function is to 'see that the jury intelligently and justly perform[ed] its duty and, in the exercise of a proper legal discretion, to determine whether there is sufficient credible evidence to sustain the verdict.' " (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251.)

The court must conduct an independent review of the evidence and "satisfy itself that the evidence as a whole is sufficient to sustain the verdict." (*Ibid*.; see also *Davis*, *supra*, 10 Cal.4th at p. 523.)

Dunlap first contends that the court erred because it did not independently weigh the evidence as required. He bases his argument on the court's reference to the jury instructions and its statement that because the verdicts were not inconsistent, there was "no reason for the Court to set aside what the jury found based on the evidence that was presented." According to Dunlap, this demonstrates that the court improperly deferred to the jury's finding of great bodily injury rather than independently assessing the evidence. The People agree, pointing to the trial court's failure to reference the evidence regarding Fernando's injuries or provide analysis as to why the injuries satisfied the elements of assault likely to cause great bodily injury.

We are not persuaded. The trial court's reference to the jury instructions and its statement that there was "no reason for the Court to set aside what the jury found based on the evidence that was presented" does not establish that it improperly deferred to the jury's findings. The court's statement could also be interpreted to mean that, based on its own review of the evidence presented and its determination that the evidence was sufficient to prove each required element, the court had no reason to order a new trial. Although it may "have been preferable for the court to have been more specific, stating it was denying the motion based on its independent weighing of the evidence, its failure to do so and its use of less than artful language cannot be equated with having applied the wrong standard." (*People v. Price* (1992) 4 Cal.App.4th 1272, 1276.)

Moreover, it is well-established that the trial court is presumed to have known and applied the correct legal standard. (*People v. Mack* (1986) 178

21

Cal.App.3d 1026, 1032.) Absent evidence to the contrary, that presumption justifies a finding here that the court applied the correct standard in reviewing Dunlap's motion for a new trial.

On the claim of error as to the merits of the trial court's decision, Dunlap argues that the evidence of great bodily injury was "relatively weak" compared to the strength of the medical expert testimony to the contrary. Specifically, Dunlap relies on Dr. O'Connell's testimony that: (1) he would not expect such a short chokehold to result in long-term disability; (2) Fernando's ability to yell during the chokehold indicated his airway and larynx remained open; (3) Fernando's injuries were minor and healed well; and (4) Fernando likely would have had a good outcome without any medical intervention. Dunlap further points to his own testimony that he did not use more force than necessary and the lack of any prosecution medical expert testimony to rebut Dr. O'Connell's testimony.

We conclude that Dunlap has failed to demonstrate the court committed a manifest and unmistakable abuse of discretion when it denied his motion. First, we disagree with Dunlap that the jury's verdicts were inconsistent and his implication that the trial court erred in finding otherwise. After successfully opposing a request by the prosecution for a jury instruction stating that serious bodily injury is the same as great bodily injury, Dunlap argued in his motion for a new trial that the two "are essentially equivalent elements."

Dunlap is correct that the elements of serious bodily injury and great bodily are often deemed equivalent. However, under certain circumstances, this general rule does not hold true. In *People v. Taylor*, for example, the jury convicted the defendant of battery with serious bodily injury while finding not true the enhancements for personally inflicting great bodily injury after

22

he punched the victim and fractured the bone near her eye. (*People v. Taylor* (2004) 118 Cal.App.4th 11, 17–18 (*Taylor*).) The defendant argued the verdicts were inconsistent, but the court disagreed: "Although the terms 'great bodily injury' and 'serious bodily injury' have been described as being 'essentially equivalent' [citation] or having 'substantially the same meaning' [citation], they have separate and distinct statutory definitions. . . . Unlike serious bodily injury, the statutory definition of great bodily injury does not include a list of qualifying injuries and makes no specific reference to bone fractures." (*Id.* at pp. 22, 24.) The *Taylor* court noted that the trial court had given standard jury instructions on serious bodily injury and great bodily injury, the terms were defined differently, and the jury applied the instructions given by distinguishing between the two terms because only serious bodily injury was defined to include a bone fracture. (*Id.* at pp. 24–25.)

The court's reasoning applies with equal force here, though it is the inverse situation—the jury here determined there was no serious bodily injury but found true the allegation that Dunlap inflicted great bodily injury. Their verdicts are consistent with the statutory definitions as well as the arguments made by counsel, who both distinguished the two terms.

Serious bodily injury is defined in section 243, subdivision (f)(4), as "a serious impairment of physical condition," including, but not limited to, a "wound requiring extensive suturing." Great bodily injury is defined in section 12022.7, subdivision (f), as "a significant or substantial physical injury," and the relevant jury instruction adds that it "is an injury that is greater than minor or moderate harm." It is reasonable based on the evidence that the jury determined that although Fernando's wound did not require *extensive* suturing—only six stitches, as Dunlap notes—or fall within

23

the other categories included in the serious bodily injury definition, his injury was more than "minor or moderate." We thus conclude that, under the particular circumstances of this case, battery with serious bodily injury is not equivalent to a finding of great bodily injury, and the jury's verdicts are therefore consistent.

Second, the prosecution presented sufficient credible evidence proving beyond a reasonable doubt that Dunlap personally inflicted more than "minor or moderate harm" on Fernando. Fernando testified that Dunlap bit, tugged, and pulled Fernando's nose with his teeth; Fernando's entire nose was in Dunlap's mouth; he felt as though a knife was going through his nose during the attack; and he feared he was going to lose his nose. Fernando also testified that he struggled to breathe during the incident and was scared he might die.

After the incident, there was blood all over Fernando's clothes and the floor, and Howard described Fernando's nose as "basically black" with blood pouring from it. Fernando testified that his pain level immediately after the incident was a 10 out of 10. The prosecution also introduced several photographs depicting Fernando's injuries showing a bloody bite mark covering the majority of his nose, which appears dark reddish purple.

As a result of the incident, Fernando was admitted to the emergency department, was given oxygen, morphine, and other medication intravenously, and received six stiches. Fernando now has a visible scar and a bump on his nose, and he still experiences daily irritation to his nose. Although Dr. O'Connell testified that, in his opinion, Fernando's injury was "minor" and had healed well, he also admitted that the medical standard for what is considered minor may be different than the legal standard. In any event, expert testimony is not binding on the trier of fact. (*People v.*

24

*Engstrom* (2011) 201 Cal.App.4th 174, 187.) The jury and the trial court were free to disregard Dr. O'Connell's conclusion that Fernando's injury was minor, and there was sufficient evidence to conclude otherwise. We therefore find no error in the trial court's denial of Dunlap's motion for a new trial.

IV

Dunlap raises three additional arguments, with which the People generally agree. First, Dunlap contends, and the People concede, that because (a) Dunlap's conviction for misdemeanor assault on Fernando is a lesser included offense of his conviction for assault likely to cause great bodily injury on Fernando, and (b) both crimes are based upon the same act, Dunlap's conviction for misdemeanor assault must be vacated. We agree. A defendant cannot be convicted of both a greater and a necessarily lesser included offense arising out of the same course of conduct. (*People v. Sanders* (2012) 55 Cal.4th 731, 736.) Where "the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*Ibid.*) Dunlap here was convicted of assault likely to cause great bodily injury and misdemeanor assault based on the same attack against Fernando. His misdemeanor conviction for assault must therefore be vacated.

Second, the parties agree remand is appropriate for the trial court to resentence Dunlap under Assembly Bill No. 518, which amended section 654 to provide sentencing courts with more discretion by removing the requirement to impose the longest term of imprisonment (Stats. 2021, ch. 441), and Senate Bill No. 567, which amended section 1170, subdivision (b), to provide, as relevant here, that the court must impose the low term under specific circumstances relating to mitigating factors (Stats. 2021,

25

ch. 731).[3]  Again, we agree with the parties.  The matter will be remanded to the trial court for resentencing.

Finally, the parties concur that the abstract of judgment should be corrected to delete the fines and fees, because the trial court granted Dunlap's request to delete the fines and fees at sentencing.  "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  In light of our remand, the request for correction of the abstract of judgment and related minute order is moot.  However, we agree with Dunlap's argument that any imposition of restitution fines would violate double jeopardy principles, as restitution fines are punitive in nature.  (See *People v. Hanson* (2000) 23 Cal.4th 355, 362–363.)  We also recognize that Government Code section 6111 eliminated the criminal justice administration fee, effective July 1, 2021.  We will therefore instruct the trial court not to impose any restitution fines or a criminal justice administration fee on remand.

## DISPOSITION

The judgment is reversed in part and affirmed in part.  Dunlap's misdemeanor assault conviction is reversed, and the corresponding sentence is vacated.  The matter is remanded to the trial court with directions to resentence Dunlap consistent with recently amended sections 1170 and 654 and issue an amended abstract of judgment that imposes no criminal justice

---

[3]  On October 8, 2021, the Governor signed three bills into law that contained provisions that amended section 1170:  Senate Bill No. 567; Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5); and Assembly Bill No. 1540 (Stats. 2021, ch. 719, § 2).  Because Senate Bill No. 567 was enacted last, it became the operative legislation, amending section 1170 and including the changes from all three bills.  (Stats. 2021, ch. 731, §§ 1.3, 3(c); Gov. Code, § 9605, subd. (b).)

administration fee or restitution fines.  In all other respects, the judgment is affirmed.



                                                        BUCHANAN, J.

WE CONCUR:



HUFFMAN, Acting P. J.



O'ROURKE, J.