Filed 3/21/23  P. v. James CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077486 |
| v. | (Super.Ct.No. RIF1606009) |
| ANTOINE DESHAWN JAMES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge.

Affirmed in part, vacated in part, and remanded with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel, and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

1

Antoine Deshawn James and two others, Anthony Eddington and Abiance Turner, were involved in a shooting that left two men dead and a third seriously wounded. At James's first trial, the jury convicted him of attempted premeditated murder, active participation in a criminal street gang, and possession of a firearm by a felon. (Pen. Code, §§ 186.22, subd. (a), 187, subd. (a), 664, 29800, subd. (a)(1); unlabeled statutory citations refer to the Penal Code.) The jury deadlocked on two murder counts, and the trial court declared a mistrial on those counts. After a retrial on the murder counts, a second jury convicted James of two counts of first degree premeditated murder. (§§ 187, subd. (a), 189, subd. (a).) Both juries also returned true findings on several gang, firearm, and great bodily injury enhancements. (§§ 186.22, subd. (b)(1)(C), 12022.7, subd. (a), 12022.53, subd. (d), (e)(1).)

On appeal, James argues: (1) The record does not contain substantial evidence that he aided and abetted the two murders; (2) the record does not contain substantial evidence that he acted with premeditation and deliberation; (3) the trial court erred in the first trial by refusing to discharge a sitting juror who knew the attempted murder victim; (4) the courts erred in both trials by admitting speculative testimony from James's former partner; (5) the courts erred in both trials by admitting evidence of uncharged prior shootings; (6) Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) requires us to reverse his conviction on the gang offense and the true findings on the gang-related enhancements; (7) the evidence of the gang's primary activities was insufficient; (8) the court erred by failing to stay his sentence on the great bodily injury

2

enhancements; and (9) we should remand for the court to exercise its discretion under recently amended section 654.

For the most part, we reject those challenges. We agree that Assembly Bill 333 requires us to vacate James's conviction on the gang offense and the true findings on the gang-related enhancements, and we remand for further proceedings. We also direct the court to stay James's sentence on the great bodily injury enhancement. On remand, James may ask the trial court to exercise its newly granted discretion under section 654. We otherwise affirm the judgment.

## BACKGROUND[1]

### I. *The Shooting*

The shooting at issue occurred in October 2015 outside a liquor store on the corner of Kansas Avenue and Seventh Street in Riverside. Surveillance video from multiple angles depicted the following events: At approximately 9:33 p.m., Francisco Ramirez was standing on the corner outside the store, talking on a cell phone. Two northbound cars on Kansas Avenue stopped at that intersection and turned left onto westbound Seventh Street. Eddington was driving the lead car, and James was a passenger in that car. Turner was driving the second car.[2]

---

[1]    As the parties acknowledge in their briefing, James's two trials involved substantially the same evidence. To the extent that there were material differences in the evidence, we note them.

[2]    The identities of the drivers and shooters is not evident from the surveillance video alone. But on appeal neither party disputes that Eddington was driving the lead car and was a shooter, and James concedes for purposes of his substantial evidence challenges

3

Eddington pulled over to the right on Seventh Street, and James exited the car. Turner passed Eddington, made a u-turn, and pulled over on the opposite side of Seventh Street from Eddington's car. James walked east toward the corner where Ramirez was standing. Turner turned off her headlights and drove forward slowly, following James from across the street.

In the meantime, Esteban Domingo and Juan Bartolo were on Kansas Avenue walking south toward Ramirez.[3] They turned right at the corner onto Seventh Street. As they walked west away from Ramirez, James walked in between them heading toward Ramirez. James walked a few steps past Ramirez, turned around, and came up behind Ramirez. He appeared to say something to Ramirez, who tried to walk away. James took his right hand out of his sweatshirt pocket, put it to Ramirez's head, and shot Ramirez.

Bartolo and Domingo turned around to look behind them. James jogged toward them and Eddington's car, which was still parked on the north side of Seventh Street. As Bartolo and Domingo moved apart to let James through, Eddington exited his car. James jogged between Bartolo and Domingo, and Eddington then fired at the two men. They

_____

that he was the passenger in the lead car and was also a shooter. In addition, neither party disputes on appeal that Turner was driving the second car. After describing the shooting, we summarize the evidence establishing James's identity.

In James's first trial, James and Turner were tried jointly but before separate juries. We decided Turner's appeal from the judgment in June 2022. (*People v. Turner* (June 20, 2022, E075454) [nonpub. opn.].) Our opinion in Turner's appeal discussed the evidence at the first trial establishing Turner's identity and role as the second driver.

[3] In the record, Domingo is also referred to by other names, such as Antonio Jose Domingo and Domingo Esteban.

4

both fell to the ground. James and Eddington quickly got into the car, made a u-turn, and drove off. Turner was at the corner of Kansas Avenue and Seventh Street, made a u-turn, and then made another u-turn to follow Eddington's car away from the scene.

Bartolo and Domingo died from their gunshot wounds. Ramirez survived the shooting but was unconscious for over a week. He testified at the first trial but not at the second trial. He said that when he awoke in the hospital, he gave a written statement about the shooting to the police. In the written statement, Ramirez said that a Black man threatened to kill him if he did not give the man money. When testifying, Ramirez could not remember any other details about the shooting, and he did not identify James as the shooter.

II. *The Investigation*

A forensic specialist found .40-caliber cartridge casings in the area where Eddington fired on Bartolo and Domingo. The specialist also found a nine-millimeter casing near the corner where James shot Ramirez.

Law enforcement analyzed the call detail records for James's and Eddington's cell phones on the night of the shooting. About 30 minutes before the shooting, at 9:05 p.m., James's cell phone connected to a cell tower roughly 11 blocks from the crime scene. The next activity on his phone occurred at 9:46 p.m., shortly after the shooting. His phone connected to another tower near the crime scene. That tower provided coverage at the crime scene and the surrounding area. At 8:44 p.m., Eddington's phone connected to a tower that was approximately six and one-half blocks from the crime scene. The next activity on his phone that night occurred at 10:22 p.m., well after the shooting.

5

In 2016, law enforcement had wiretaps on James's and Eddington's cell phones and conducted a number of interviews to stimulate wire conversations. To start, officers interviewed Kayliegh Gallegos in late August 2016. Gallegos is James's former girlfriend and the mother of his child. The officers showed her surveillance video of the shooting.

Right after the interview, Gallegos called James. She told James: "[T]hey have surveillance of you, Antoine." James asked what she meant, and she replied: "They show—he even showed me surveillance tapes of you—of—of someone who—with—who looks just like you." Gallegos further explained: "[F]rom a glimpse, it looks just like you, but I can—I know it wasn't you." She said that she told the officers the man in the surveillance video was not James. He asked what the officers said and if he had to turn himself in. Gallegos replied that they were "not saying nothing" and that they were still investigating. During the call, Gallegos did not mention the location of the shooting or Kansas Avenue.

James called T.W. Smith after talking to Gallegos. James and Smith belonged to the same gang, the 1200 Blocc Crips. (We discuss the gang evidence in the following subpart.) James said that the officers showed Gallegos "the video of that shit on the corner of Kansas." James asked Smith if he knew anyone who could get a false ID and indicated that he was thinking about fleeing.

Shortly after the call with Smith, James called Gallegos. They discussed the video again. Gallegos said that "at first glance," the man looked "just like" James, but she knew that it was not him. He asked how she knew it was not him and if there was

something she could "recognize off top" to show that it was not him. Gallegos said that the man looked like "the one with the twin," who looked just like James. James asked if she saw "the tattoos on the eyes." (James has "12" tattooed under one eye and "00" tattooed under the other.) Gallegos responded that she could not see the man's eyes. She also said that the man did not walk like James, and James did not have a jacket like the man's.

According to Gallegos's trial testimony, she did not recognize anyone in the surveillance video, and she told the officers that the man in the video did not resemble James. She was not "in the right state of mind" when she called James after the law enforcement interview, because she was addicted to methamphetamine at the time. She told him that the officers had surveillance video of him because that is what they told her, but she did not believe that it was him in the video. She did not know that her phone calls with James were being recorded.

Gallegos further testified that she was shocked and concerned when the officers came to her home. She was worried about James because they had a child together, she cared about him, and she did not want something bad to happen to him. Even if she had recognized James in the video, she probably would not have said that it looked like him, because she did not want anything to happen to him.

After James's second call with Gallegos, James and Smith spoke on the phone again. James told Smith what Gallegos had said about the video. Smith said that somebody had "loose lips" and "they [were] building," but nothing "concrete" was

7

"going on." Smith added that "the snitches have said what they had to say already." James again indicated that he was thinking about fleeing.

In early September 2016, the Riverside Police Department updated its social media pages with photographs and surveillance video from the shooting, and the department asked for the public's help in solving the crime. The social media posts also described one of the involved cars as dark-colored and similar to a Dodge Charger.

James called Eddington on the day of the social media postings. James said that someone was "bumping their gums" and referred to "the three-banger." He also said: "I know they're coming. Sooner or later, they're coming, bro." Eddington advised James to "have that alibi ready." James asked Eddington to "look on that—that get-down" to see if "the marks on . . . the eyes" were visible. Eddington assured him: "No, you don't see, bro. I looked at it ev—it's too blurry." Eddington said that James only had to worry about someone "bumping his gums and saying, 'It was Antoine.'" James replied that nobody could say that "but those people."

Two days later, officers interviewed Turner and her mother. Turner's mother called James afterward. Soon after that call, James called Eddington twice. In the first call, James urged Eddington to get rid of his car and said that "[t]hey went and hollered at" Turner and her mother. Eddington replied that law enforcement was looking for a Dodge Charger, and his car was not a Charger. (Eddington owned a Chevy Malibu.) James persisted and suggested that Eddington paint the car. In the second call, Eddington suggested that he get into a car accident to dispose of his car. They also discussed the video that had been posted online, and Eddington was "laughing to [him]self" because

8

there was "no way" anyone could be identified in the video. Eddington stated that there was "only one person there that could have said . . . anything." James agreed and said that the person "don't talk." James also told Eddington that it was good Turner's mother had talked to the officers, because she relayed a conversation to him that "opened up a lot of shit." James said that he was worried.

In September 2016, officers also interviewed Antoine Cross, another of James's fellow gang members. Cross went by the moniker Baby Gunz or BG. After that interview, Eddington called James. Eddington said that officers had talked to BG. According to BG, the officers knew Eddington's name, and somebody was "singing." Eddington said that no one could "point a finger" other than "our circle." James advised him to be prepared. Eddington responded that he was "trying to figure something" out and that he had already talked to his mother. That same day, law enforcement installed a tracker on Eddington's car.

Several days later, law enforcement interviewed Turner's mother again. James and Eddington talked yet again that day. James indicated that the officer and Turner's mother "spoke on a black vehicle." Eddington replied: "[I]t's already about to be gone. Don't trip." The next day, the tracker on Eddington's car showed that the car moved to a hospital parking lot, where it remained for several days. The car then moved to a location 2.5 hours away. The tracker's battery died at some point after that, so law enforcement lost track of the car.

In December 2016, Eddington died in a shootout with law enforcement officers who were attempting to serve a warrant for his arrest.

III. *Gang Evidence*

Detective David Riedeman of the Riverside Police Department testified as the People's gang expert. Riedeman started working for the department in 2000 as a patrol officer. He began talking to gang members while working patrol, and he first became familiar with the 1200 Blocc Crips when he patrolled the gang's territory. He was eventually promoted to a detective in the gang unit, where he worked in 2015. The gang unit covered all of the gangs in Riverside.

Patrol officers frequently informed the gang unit about what was happening on the streets. The patrol officers also sent the gang unit reports of crimes that the officers believed were gang related. Each of the six detectives in the gang unit, including Riedeman, reviewed all of those reports. As a group, the gang unit determined whether to seek gang charges or gang enhancements in connection with the crime reports. Also, the detectives in the robbery/homicide unit frequently called on the gang unit for assistance.

Riedeman developed reliable confidential informants while in the gang unit. The informants were active associates or gang members who provided the unit with information, typically in exchange for money. He also listened to phone calls of suspected gang members, recorded by wiretap or while the suspects were in jail. The detectives in the gang unit "were a very tight team." They shared the intelligence that they gathered from informants and recorded calls.

Riedeman opined that James and Eddington were members of the 1200 Blocc Crips gang and that Turner was an associate of the gang. The 1200 Blocc Crips are a

predominantly Black gang whose territory is on the east side of Riverside. In 2015, there were 150 documented members of the gang. The gang's primary criminal activities were sales of narcotics, violent assaults, and possession of firearms. Riedeman identified four "predicate offenses" for which 1200 Blocc Crips members were convicted—a multiple murder in 2008, an attempted murder in 2009, and two cases of felon in possession of a firearm in 2012.

The Bogarts were a "squad" of the 1200 Blocc Crips. A squad is a group of people within the gang who work together and "do[] their own thing." James was the leader of the Bogart squad. In an April 2015 video found on James's phone, James identified himself as the "General" of the squad. Members of the squad referred to each other as "Bogart." Eddington's moniker was Neff Bogart, and Turner's moniker was Princess Bogart.

Law enforcement downloaded a copy of James's cell phone in July 2015. In May 2015, Eddington sent James a text message stating: "Bogart please keep my engine wit you when you leave out here leave it wit twin no one else please."[4] Riedeman opined that "engine" meant a firearm. He explained that gang members rarely referred to weapons by their true names and instead used "different terms" to refer to them. Eddington also texted James in June 2015 and asked James to get his "clip" from another 1200 Blocc Crips member. A few days later, Eddington texted again, asking if James had

---

**4** We quote James's text messages as they appear in the record, including any typographical errors.

talked to their fellow gang member, because Eddington "need[ed] that oil pan foe the engine." Riedeman opined that "clip" and "oil pan" referred to a magazine for a firearm.

East Side Riva, a Hispanic gang, is a rival of the 1200 Blocc Crips. The two gangs claim the same general territory, but each gang has its own strongholds in the area. The shooting in this case occurred at an East Side Riva stronghold.

The rivalry between the 1200 Blocc Crips and East Side Riva dated back to a conflict in the early 1990's. The violence between the gangs escalated over the years from assaults or fights to shootings and killings. By 2015, East Side Riva was assaulting random Black men in 1200 Blocc Crips' territory, even if those men were not gang members. The 1200 Blocc Crips were also assaulting and killing random Hispanic men. Riedeman opined that a 1200 Blocc Crips member would earn respect within the gang for killing a Hispanic male, even if the victim were not a gang member. (There was no evidence that the three victims in this case were gang members.) The killing would also benefit the gang by strengthening its violent reputation and inspiring fear in the community. In response to a hypothetical question mirroring the facts of this case, Riedeman opined that the shooting was committed for the benefit of a criminal street gang.

Riedeman testified that gang members are always watching each other's backs and that they are expected to back each other up when violence erupts. If a person failed to back up a fellow gang member, that person would lose respect within the gang, and the gang could discipline that person by administering a "beatdown."

IV. *Evidence of Prior Shootings*

At the first trial, the People introduced evidence of three prior shootings. The People introduced evidence of only two of those shootings at the second trial.

A. *Santa Ana Shooting* (*First and Second Trial*)

On April 27, 2015, a 1200 Blocc Crips member performed at a concert venue in Santa Ana. Several hundred people were at the venue, including numerous 1200 Blocc Crips members. Officers responded to a call about multiple fights at the location. A few minutes after the officers arrived at 10:34 p.m., they heard approximately 15 gunshots coming from an overflow parking lot. Four nine-millimeter shell casings found at that parking lot were fired from the same gun that shot Ramirez.

James's text messages showed him making plans to attend the concert in Santa Ana. His cell phone contained a video file recorded on April 27, 2015, at 10:43 p.m. The video depicted only a black screen, as though the camera lens were covered, but the phone also recorded audio. In the 12-second recording, a man could be heard referring to people "coming our way," and then another man referred to the people being "right there." The men used racial and homophobic slurs to refer to the people who were approaching. One second after that, six gunshots rang out.

James received a text message at 11:11 p.m. that night, stating: "Just left. Okay for you you to leave. Cops posted out front. People leavingouttheback." James replied: "I'm outta there bloec."

B. *Vermont Street Shooting* (*First and Second Trial*)

Approximately three hours after the Santa Ana shooting, at roughly 1:44 a.m. on April 28, 2015, a shooting occurred at Vermont Street and Eucalyptus Avenue in Riverside. That intersection is a stronghold of the 1200 Blocc Crips. Officers found 12 nine-millimeter shell casings at the scene and 11 other casings. Three of the nine-millimeter casings were fired from the same gun that shot Ramirez.

At 1:57 a.m. on April 28, 2015, James received a text message asking where he was. James responded: "'On the V.'" The 1200 Blocc Crips referred to Vermont Street as "the V."

Willie Meadows is James's cousin and an inactive 1200 Blocc Crips member. The People and James stipulated that Meadows was present during the April 28 shooting on Vermont Street. They also stipulated that James admitted to being with Meadows on the night of the shooting. James was never arrested in connection with the Vermont Street shooting.

C. *Twelfth Street Shooting* (*First Trial Only*)

A shooting occurred on July 17, 2015, at around 12:26 a.m., near Twelfth Street and Kansas Avenue in Riverside. The victim of the shooting died from multiple gunshot wounds.

Law enforcement interviewed James about the shooting, but he was never arrested for the victim's murder. James said that on July 17, 2015, he was in Victorville with Gallegos. However, call detail records for his cell phone showed that he was in Moreno Valley on July 17. More specifically, seven minutes after the shooting, his phone

14

connected to a cell tower in Moreno Valley. A few minutes after that, his phone connected to a tower near his Moreno Valley home.

Turner's mother and James exchanged text messages between 12:38 a.m. and 12:54 a.m. on July 17. She had heard about shots at "'12 & Kansas'" where "'a Mexican was hit.'" James said that he was not "'out that way.'"

A few hours later, at 3:07 a.m., James received a text message from another sender stating: "'Cuz all tools are accounted for. East Cyde Bro.'" James and Eddington exchanged text messages later that morning, starting at 7:04 a.m. Eddington texted James: "'Better thank God you didn't use your Weed Eater chyt would of blew up.'" Eddington also mentioned the weed eater being rusted and the "'Batteries'" on the "'beam'" being dead. Eddington then texted: "'Haha so my Weed Eater cut grass good huh.'" James replied: "'Yessssir.'" The lead investigator was interested in those text messages because James and Eddington appeared to be talking in code about something other than weed eaters.

V. *Relevant Procedural Background*

The People charged James with five offenses: the murders of Bartolo and Domingo, the attempted premeditated murder of Ramirez, active participation in a criminal street gang, and possession of a firearm by a felon. (§§ 186.22, subd. (a), 187, subd. (a), 189, subd. (a), 664, 29800, subd. (a)(1).) In connection with the murder counts, the information also alleged that James committed multiple murders (multiple murder special circumstance); that Bartolo and Domingo were intentionally killed because of their race, color, religion, or national origin (hate crime special circumstance); and that

15

they were intentionally killed while James was an active participant in a criminal street gang (gang special circumstance). (§ 190.2, subd. (a)(3), (a)(16), (a)(22).) In addition, the information alleged gang and firearm enhancements with the murder and attempted murder counts and an enhancement for great bodily injury with the attempted murder count. (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (d), (e), 12022.7, subd. (a).) Finally, the information alleged that James had served one prior prison term, had three prior serious felony convictions, and had three prior strike convictions. (§§ 667, subds. (a), (c), (e)(2)(A), 667.5, subd. (b), 1170.12, subd. (c)(2)(A).)

The jury at James's first trial in 2019 convicted him of the attempted premeditated murder of Ramirez, active participation in a criminal street gang, and possession of a firearm by a felon, but the jury deadlocked on the murder counts. That first jury also found true the gang, firearm, and great bodily injury enhancements attached to the attempted murder count.

Before the second trial, the trial court granted the People's motion to dismiss the hate crime special circumstance allegations. The jury at the second trial in 2021 convicted James of the first degree premeditated murders of Bartolo and Domingo. It also found true the gang and firearm enhancements attached to the murder counts. But the jury found not true the multiple murder and gang special circumstance allegations.

The court granted the People's motions to strike or dismiss the prior prison term allegation, one of the prior strike allegations, and one of the prior serious felony allegations. James admitted the remaining two prior strikes and two prior serious felony

16

convictions.  The court sentenced him to a total indeterminate sentence of 250 years to life in prison, plus a total determinate sentence of 13 years in prison.

DISCUSSION

I. *Substantial Evidence Challenges to the Murder Convictions*

With respect to the charged murders of Bartolo and Domingo, the trial court instructed the jury on a single theory of accomplice liability:  direct aiding and abetting. The court also instructed the jury on a single theory of first degree murder:  premeditated murder.  James argues that the record does not contain substantial evidence showing that he aided and abetted the murders or that he acted with premeditation.  We disagree on both counts.

A. *Standard of Review*

In resolving a substantial evidence claim, we review "the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128.)  We resolve all conflicts in the evidence and credibility questions in favor of the verdict. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  We do not reweigh the evidence or reevaluate witness credibility. (*People v. Nelson* (2011) 51 Cal.4th 198, 210, fn. 5.)  "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.]  We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*Zamudio*, *supra*, at p. 357.) "'Evidence of a defendant's state of mind is almost inevitably circumstantial, but

17

circumstantial evidence is as sufficient as direct evidence to support a conviction.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 (*Nguyen*).)

B. *Aiding and Abetting*

A person directly "'aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Marshall* (1997) 15 Cal.4th 1, 40.) "'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*Nguyen*, *supra*, 61 Cal.4th at p. 1054.)

The direct "aider and abettor's mental state must be at least that required of the direct perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) In the case of murder, the accomplice must "know [of] and share the murderous intent of the actual perpetrator." (*Ibid*.) And in an express malice case like this one, the accomplice must act with intent to kill. (§ 188, subd. (a)(1); *People v. Swain* (1996) 12 Cal.4th 593, 601 ["unlawful 'intent to kill' is the functional equivalent of express malice"].)

James argues that there is no evidence that he (1) knew Eddington intended to kill Bartolo and Domingo, (2) shared that intent, or (3) did something to aid, promote, encourage, or instigate the murders. But viewing the evidence in the light most favorable to the judgment, the record contains substantial evidence of all three elements.

18

The evidence showed that James and Eddington were members of the 1200 Blocc Crips, James was the leader of a squad within the gang, and Eddington was a member of that squad. The 1200 Blocc Crips had a longstanding rivalry with a Hispanic gang, East Side Riva. That rivalry had escalated over the years to the point that by 2015, the year of the charged offenses, members of the 1200 Blocc Crips were assaulting and killing random Hispanic men. The evidence also showed that gang members were expected to back each other up when violence occurs.

Against that backdrop, James and Eddington armed themselves with guns and drove to an East Side Riva stronghold, where James got out of the car. Turner, an associate, followed them in a second car. She appeared to be acting as a lookout. She pulled over across the street from Eddington's car, and when James exited the car, she turned off her headlights and followed James slowly. James walked down the street, crossing paths with Bartolo and Domingo. In the video, James appeared to be one foot or so away from each victim when he walked in between them. James then briefly interacted with Ramirez before shooting him in the head. Eddington got out of the car as James was running back to the car, waited for James to pass between Bartolo and Domingo, and then shot the two men. James and Eddington quickly got into the car and drove away, followed by the lookout car.

From the foregoing evidence, the jurors could reasonably conclude that James and Eddington had a preconceived plan to enter their rivals' stronghold and kill one or more Hispanic victims. The jurors could also reasonably infer that James knew Eddington would protect him by killing anyone who witnessed the events and could potentially

19

identify James. Moreover, the jury could reasonably infer that James also intended for the witnesses who might identify him to be killed. Bartolo and Domingo were so close to James that he had a strong motive for wanting them dead. (See *People v. Smith* (2005) 37 Cal.4th 733, 741 ["evidence of motive is often probative of intent to kill"].)

James focuses on the lack of direct evidence of his knowledge and intent. For instance, he argues that there were no text messages or recorded phone calls showing that Eddington planned to kill someone and that James knew of that plan. But there need not be direct evidence of a defendant's state of mind—circumstantial evidence and reasonable inferences drawn from it are sufficient to support the convictions. (*People v. Clark* (2016) 63 Cal.4th 522, 626.)

Our Supreme Court's decision in *Nguyen* is instructive. The evidence that the defendant in that case knew of the shooter's intent to kill and shared the shooter's intent consisted of circumstantial evidence and reasonable inferences. The *Nguyen* defendant belonged to an Asian gang, and the attempted murder victim was driving a car full of rival gang members. (*Nguyen*, *supra*, 61 Cal.4th at pp. 1026-1027, 1053.) The gang expert testified that Asian gangs did not claim particular turf but went around the community hunting for their rivals. (*Id.* at p. 1054.) He explained that gang members would be expected to back each other up in a shooting. (*Ibid.*) In addition, the defendant's gang and the rival gang "were in a state of war, and members of both gangs were expected to be able to engage in gunfights with their rivals 'at a moment's notice.'" (*Ibid.*) As for the evidence of the shooting, the defendant was riding in the back seat of his group's car, and the shooter was in the front passenger seat. (*Id.* at p. 1053.) The

20

defendant's car followed the rival gang members' car, and the defendant and his associates stared at the rivals as one car passed the other. (*Ibid*.) When the two cars stopped at an intersection, the defendant's associate shot the rivals' driver. (*Ibid.*)

The *Nguyen* court held that the incident-specific evidence plus the gang evidence constituted substantial evidence that the defendant aided and abetted the attempted murder. (*Nguyen*, *supra*, 61 Cal.4th at pp. 1055-1056.) The court observed that although the gang evidence standing alone could not prove the defendant aided and abetted the crime, the gang evidence strengthened the inferences arising from the defendant's conduct. (*Id.* at p. 1055.) Thus, the evidence of the gang war and the practices of Asian gangs permitted the jury to infer that the defendant knew of the shooter's intent to kill, shared that intent, and aided the shooter by spotting potential targets. (*Ibid*.)

Similarly, here the gang evidence (the violent rivalry between the 1200 Blocc Crips and East Side Riva, James's leadership role in the squad, the expectation that gang members would back each other up, and the location of the attack in rival gang territory) plus the incident-specific evidence (the appearance of coordination and preplanning, the fact that James and Eddington both armed themselves with deadly weapons, and James's shooting of Ramirez) permitted a reasonable inference that James knew of his confederate's intent to kill and shared it.

With respect to the remaining element, there is also substantial evidence that James "by act or advice . . . instigate[d]" the killings. (*People v. Marshall*, *supra*, 15 Cal.4th at p. 40.) James walked in between Bartolo and Domingo as he approached Ramirez, and he shot Ramirez about 11 seconds later, knowing that the two men would

21

witness Ramirez's shooting. James could have waited until Bartolo and Domingo had moved past the scene, or he could have abandoned his intent to shoot Ramirez altogether. But he chose neither course. James's intentional act therefore gave Eddington a reason to kill Bartolo and Domingo. That evidence is sufficient to show that James instigated the killings.

In sum, the record contains substantial evidence that James aided and abetted the murders of Bartolo and Domingo.

C. *Premeditation*

"'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] The reflection may be arrived at quickly; it need not span a specific or extended period of time." (*People v. Lopez* (2018) 5 Cal.5th 339, 354-355.) Evidence of planning, preexisting motive, and the manner of killing bears on whether a killing was premeditated, but those three factors do not "establish an exhaustive list that would exclude all other types and combinations of evidence." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

The same evidence that showed James's intent to kill Bartolo and Domingo was sufficient to show James's premeditation and deliberation. The history of violence with the rival Hispanic gang, the coordinated attack on a Hispanic victim in rival gang territory, and the use of two shooters each with their own deadly weapon evidenced a preconceived plan to kill multiple victims. And the motive to kill Bartolo and Domingo in particular arose when they became witnesses to the attack on Ramirez. James passed

between them and shot Ramirez approximately 11 seconds later. That period of time, although short, was sufficient for James to reflect on what his actions would mean for Bartolo and Domingo. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127 ["Premeditation and deliberation do not require much time [citation], for "'[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly"'"].)

On this record, the jury could reasonably infer that the murders were the result of preexisting thought and reflection on James's part and not the result of unconsidered impulse. Substantial evidence thus supports the jury's finding of premeditation and deliberation.

II. *Denial of Motion to Discharge Juror*

James argues that the court violated his federal constitutional rights and erred under state law by denying his motion to discharge a juror during the first trial. He also moved for a new trial on the ground that the court committed legal error by refusing to discharge the juror, so he contends that the court erred by denying his new trial motion as well. We conclude that the court did not err.

A. *Relevant Background*

After Ramirez testified, Juror No. 7 realized that she knew him in her professional capacity. The court questioned Juror No. 7 after Ramirez was excused. The juror was an outreach worker for a nonprofit organization that provided social services for unhoused and low-income individuals. Ramirez was one of her clients. She saw his name on the witness list, but because he had a common name, she did not realize that he was her client until she saw him. She had "a lot" of clients.

23

Juror No. 7 had met with Ramirez numerous times over the last four years, most recently two weeks ago. He came in for food assistance, so the nonprofit gave him groceries. She could not state with precision the number of times that she had met with him. Ramirez documented with the nonprofit as "transient." He would come in for assistance repeatedly—sometimes as many as three times in one week—but then "something happens," and he would disappear "for a couple of months."

The court advised Juror No. 7 that she could not let bias, sympathy, prejudice, or public opinion influence her decision, and in particular, she could not be biased in favor of or against any of the parties, lawyers, or witnesses. The court also explained that she could not let bias interfere with her judgment as to the believability of anybody's testimony. The court asked if she understood and would be able to do all of that, and she replied "Yes" to both questions. The court then explained that she had to decide the case on the basis of the evidence in court. It said that she could "look at any witness, including Mr. Ramirez," and make up her mind about their believability and credibility but that she could not decide someone was credible and trustworthy "simply because you know them." Again, the court asked if she understood and would be able to follow that instruction, and she said "Yes" to both questions. Finally, the court ordered Juror No. 7 to refrain from telling the other jurors that she had spoken with Ramirez, and it ordered her not to share any information that she had learned about him outside the trial setting. She said that she would follow the court's order.

After the court's questioning, James made an oral motion to discharge Juror No. 7 for cause. He argued: "[S]he has too much information and has too much of a direct

24

relationship with an alleged victim in this case. And that information given, who Francisco Ramirez is, his patterns and practices, and what led up to the night of the shooting, may be a materially disputed issue in this case."

The court explained that it was inclined to deny the motion. It thought that Juror No. 7 was "an honest individual," which was reflected in the fact that she brought her professional relationship with Ramirez to the court's attention when she became aware of it. The court also thought that she was intelligent and forthright, and she understood that she could not let bias or sympathy interfere with her judgment. The court observed that although Ramirez testified he was shot, that issue was undisputed; the issue in dispute was the identity of the shooter, and Ramirez's testimony did not bear on the shooter's identity. The court further explained: "Now there is an inherent bias, I suppose, that would exist that we could talk about beyond the state of the evidence. That is, that she would be biased in favor of the victim in this case because she has a professional relationship with him. I'm satisfied her answers would suggest that she could follow the Court's instructions."

James then asked to explain his argument more fully. He argued that the juror did not just "know[]" Ramirez—she had a four-year relationship with him that sometimes involved multiple meetings per week, and she met with him as recently as two weeks ago. He argued that her information about Ramirez might be relevant to the hate crime special circumstance and the gang special circumstance. (§ 190.2, subd. (a)(16), (22).) That is, she might have information about whether he was involved with a gang or was merely an innocent bystander.

The court questioned Juror No. 7 again after hearing from James. It asked whether she interviewed clients about what was happening in their lives. She said that she sometimes did, depending on the services they were seeking. But she had not talked to Ramirez about the shooting and was not previously aware of it.

The court denied the motion to discharge the juror. After the jury returned its verdict, James moved for a new trial on the ground that the court had committed legal error by refusing to discharge the juror. (§ 1181, subd. (5).) James argued that the circumstances showed an actual and implied bias on the part of Juror No. 7. (Code Civ. Proc., § 225, subd. (b)(1)(B), (C).) The court denied the new trial motion. The court observed that the juror might have had "an ordinary and normal reaction for any juror, that is, to be sympathetic to the victim," but she was "properly instructed" and "gave proper answers in regard to removing sympathy from the equation." The court concluded that it had properly exercised its discretion not to discharge the juror and that James had not suffered any prejudice.

B. *Analysis*

A defendant may move to discharge a sitting juror for "good cause." (§ 1089.) The court may remove the juror if it finds the juror is "unable to perform his or her duty." (*Ibid.*) Actual bias renders a juror unable to perform their duties and thus subject to discharge. (*People v. Lomax* (2010) 49 Cal.4th 530, 589.) Actual bias is "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to

26

the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C); *People v. Ayala* (2000) 24 Cal.4th 243, 271-272.)

We review the trial court's decision to retain a juror for abuse of discretion. (*People v. Jablonksi* (2006) 37 Cal.4th 774, 807.) "'Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality." The court will not presume bias, and will uphold the trial court's exercise of discretion . . . if supported by substantial evidence.'" (*Ibid*.) In according deference to the trial court's ruling, we recognize that the trial judge who observes the "juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." (*People v. Stewart* (2004) 33 Cal.4th 425, 451.)

James fails to show that the trial court abused its discretion by declining to discharge Juror No. 7. The record shows that the juror had a professional relationship with the attempted murder victim, Ramirez. She was an outreach worker at a nonprofit organization providing social services, and Ramirez had been one of her many clients for the last four years. But the record does not show her inability to act impartially as a demonstrable reality. The manner in which she came forward supported the court's determination that she could be impartial—she disclosed the professional relationship as soon as she realized it, right after Ramirez's testimony. The circumstances here are like those in *People v. Ray* (1996) 13 Cal.4th 313, in which a sitting juror disclosed a connection to the attempted murder victim's daughter. (*Id.* at pp. 325, 342.) The juror

27

became aware of the connection only after the victim had testified. (*Id.* at pp. 342-343.) Our Supreme Court observed that if the juror "had formed improper opinions about the case and intended to act in ways prejudicial to the defense, common sense suggests that he would have simply remained silent," and the juror's voluntary disclosure indicated that the juror was "attempting to perform his duties in good faith" and could remain impartial. (*Id.* at p. 344; accord *People v. McPeters* (1992) 2 Cal.4th 1148, 1175, 1174 (*McPeters*) [sitting juror's "candid disclosure" of real estate transaction with the murder victim's husband, as soon as the juror realized the connection, supported the juror's stated "determination to be a fair and impartial juror"].) Similarly, common sense suggests that if Juror No. 7 were biased, she would not have disclosed the connection and would have quietly used her position to influence a verdict against James.

Besides Juror No. 7's timely and voluntary disclosure, when the court explained that she could not let bias, sympathy, or prejudice influence her decisions, Juror No. 7 unequivocally stated that she understood and would follow that instruction. And after observing her during questioning, the court found her to be honest, forthright, intelligent, and capable of following the court's instructions. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1198, 1210-1211 [sitting juror had taken fitness classes taught by murder victim's brother, and the trial court, "which was in a position to observe [the juror's] demeanor, found no evidence of disqualifying bias"].) On this record, there was substantial evidence supporting the court's determination that Juror No. 7 could be impartial and perform her duties, so the court did not abuse its discretion by declining to discharge her.

28

James relies heavily on *People v. Romero* (2017) 14 Cal.App.5th 774 (*Romero*) to argue that the court abused its discretion, but that case is distinguishable. The juror in *Romero* was the victim's high school teacher three years before the trial. (*Id.* at p. 779.) When the court asked the juror whether she thought her relationship with the victim would affect her ability to be fair and impartial, the juror replied, "'Not really. She was a good student. I remember positives. But I still think I can be fair.'" (*Ibid.*) The court then asked if there was anything about her experiences with the victim that would cause the juror to "'favor'" the victim's testimony or to prejudge the case in any way, and the juror responded, "'I don't think so.'" (*Ibid.*)

The *Romero* court held that the trial court abused its discretion by refusing to discharge the juror. (*Romero*, *supra*, 14 Cal.App.5th. at pp. 781-783.) The appellate court relied on the "depth and degree" of the teacher-student relationship, which was evidenced by the fact that three years later, the juror continued to have positive memories and impressions of the victim. (*Id.* at pp. 781-782.) "Critically," it did not appear that the trial "court looked beyond [the juror's] statement that she did not 'think' her favorable teacher-student relationship" with the victim would affect how the juror viewed the evidence. (*Id.* at p. 782.) The appellate court reasoned that the juror's positive impression of the victim "was especially critical," given that the prosecution's sexual assault case relied heavily on the victim's credibility and her ability to recall the crime; the victim identified the defendant and recounted the details of the crime. (*Id.* at pp. 783, 778-779.) But there was no DNA or other forensic evidence connecting the defendant to the crime. (*Ibid.*)

29

This case differs from *Romero* in important respects. Juror No. 7 described Ramirez as her client, but she never expressed a positive impression of Ramirez. Even if she had, her positive impression of Ramirez would not have been a critical factor, because his testimony was not critical to the prosecution's case against James. Ramirez's testimony was brief. He testified that he was shot and woke up in the hospital, but there was no dispute about that. The shooting was captured on video. Ramirez could not identify James, whose identity as the shooter was established by other evidence. Moreover, the *Romero* juror appeared somewhat uncertain about whether she could be impartial—she said, "'Not really,'" and "'I don't think so,'" in response to questions about whether her relationship with the victim would affect her ability to be fair and impartial. (*Romero*, *supra*, 14 Cal.App.5th. at p. 779.) Juror No. 7's responses were not at all equivocal. Given those differences, *Romero* does not compel the conclusion that the court here abused its discretion.

James also argues that the court erred because the relationship between Juror No. 7 and Ramirez was ongoing, and her fear of embarrassment, criticism, or a loss of trust when dealing with Ramirez in the future would cause her to convict James. But the cases on which James relies are inapposite. In one, a sitting juror worked in the same office as the defendant's brother and used a desk 25 feet away from the brother. (*People v. Abbott* (1956) 47 Cal.2d 362, 371.) The juror did not disclose the connection, and the trial court discovered it through other means. (*Id.* at p. 370.) The trial court discharged the juror "to save [him] from embarrassment or criticism," given his proximity to the defendant's brother. (*Id.* at p. 371.) Our Supreme Court held that the trial court did not abuse its

discretion by discharging the juror. (*Ibid.*) But it does not follow that a trial court faced with different facts abuses its discretion by declining to discharge a juror. The law allows for the possibility that reasonable judges may come to different conclusions on an issue without abusing their discretion. (See *People v. Mataele* (2022) 13 Cal.5th 372, 412, fn. 5 [observing that it was "not incongruous to determine that the trial court . . . acted within its discretion" by excluding evidence, when other trial courts acted within their discretion by admitting similar evidence under similar circumstances]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1253 [the defendant's arguments showed only that a court might have reasonably reached one conclusion, not that the trial court abused its discretion by reaching the opposite conclusion].)

In the other case on which James relies, our high court held that the trial court erroneously denied the defendant's motions to change venue in a murder case. (*People v. Tidwell* (1970) 3 Cal.3d 62, 64.) The court's holding that the defendant could not receive a fair trial in the county was based on a number of factors, including the small size of the community (a population of 17,500), the brutal nature of the murders, the prominent position of at least two of the murder victims in the community, the pervasive news coverage of the prosecution evidence, and the countywide hostility toward the defense. (*Id.* at pp. 64-65, 72-73.) Part of the court's analysis focused on the fact that because the crimes took place in such a small community, eight jurors knew prosecution witnesses, two jurors knew members of the victims' family, and four jurors knew at least one of the victims. (*Id.* at pp. 67-68, 74-75.) The circumstances here—one juror who had a professional relationship with the victim—do not remotely approach those in *Tidwell*,

31

either in terms of the number of jurors who knew victims and witnesses or in terms of other factors showing that the jurors could not be fair and impartial.

Lastly, citing *In re Manriquez* (2018) 5 Cal.5th 785 (*Manriquez*), James suggests that the trial court could not rely on Juror No. 7's assurances that she could be unbiased. *Manriquez* was a habeas corpus proceeding in which the petitioner claimed a juror had committed misconduct by failing to disclose pertinent information about herself on a pretrial questionnaire. (*Id.* at pp. 790-791.) The Supreme Court appointed a referee to conduct an evidentiary hearing at which the juror testified. (*Id.* at p. 791.) In pertinent part, the juror testified that she was not biased against the petitioner at any point during trial, although she conceded that she did not know the legal definition of bias. (*Id.* at p. 800.) The referee overruled the petitioner's objections to the testimony and found that the juror was not biased, relying in part on her statement that she was not biased. (*Ibid.*)

Our high court held that the referee could not properly base his finding solely on the juror's belief that she was unbiased, given that "a court 'cannot substitute the opinions of jurors for its own findings of fact.'" (*Manriquez*, *supra*, 5 Cal.5th at p. 800.) The *Manriquez* court also observed that "jurors are sometimes unaware of their own biases, or are reluctant to admit to having biases." (*Id.* at p. 801.) "Accordingly, when assessing [the juror's] possible bias," the court declined to "consider the referee's finding that [the juror] believed she was not biased to the extent the referee relied on [the juror's] *assessment of her own bias*." (*Ibid.*)

*Manriquez* does not stand for a bright line rule that the trial court can never rely on a juror's statement that they can be unbiased. Indeed, the month before *Manriquez*, our

high court decided *In re Cowan* (2018) 5 Cal.5th 235 (*Cowan*), another habeas proceeding involving a claim of juror bias, and the court relied on the juror's assessment of his own bias. (*Id.* at pp. 238, 243, 246.) The referee found that (1) the juror's failure to disclose certain information was not indicative of bias and (2) the juror was not actually biased. (*Ibid.*) The *Cowan* court held that both findings were supported by substantial evidence, including the juror's testimony that "he felt no bias towards either Cowan or the prosecution," "came to court with an 'open mind,'" and was "fair and impartial." (*Id.* at pp. 246, 243.) The *Manriquez* court did not disapprove of *Cowan* or any other case in which the court relied on a juror's assurance of their own impartiality. (See, e.g., *In re Hamilton* (1999) 20 Cal.4th 273, 298, 301 [substantial evidence supported referee's finding that juror was not biased, including juror's claim of impartiality, which the referee expressly credited]; *McPeters*, *supra*, 2 Cal.4th at p. 1175 [trial court did not abuse its discretion by concluding juror was not biased, because juror "affirmed his belief he could be fair and impartial," among other reasons].)

To the extent that *Manriquez* held a finding of lack of bias cannot be based *solely* on a juror's belief that they are unbiased, this case does not violate that rule. Juror No. 7's statement that she would not let bias interfere with her decisions was supported by the circumstances of her disclosure and the court's assessment of her demeanor during questioning.

For all of these reasons, we conclude that the court did not abuse its discretion by denying James's motion to discharge Juror No. 7. It follows that the court did not abuse its discretion by denying his new trial motion, which was based on the same claimed

error. And we reject James's undeveloped assertion that the court's claimed error separately violated his federal constitutional rights. (*People v. Earp* (1999) 20 Cal.4th 826, 881 [rejecting claim that state law error violated federal constitutional rights, because the claim was not supported by adequate argument].)

III. *Challenge to Gallegos's Testimony*

James contends that the court erred in both trials by admitting Gallegos's testimony about what she would have done if she had recognized James in the surveillance video. He argues that her testimony was speculative and should have been excluded on that ground. He asserts that the courts violated both state law and his federal constitutional right to due process. The argument lacks merit.

To review, Gallegos testified that she did not recognize anyone in the surveillance video of the shooting, and she told law enforcement that the man in the video did not resemble James. On cross-examination, she said that she probably would not have told law enforcement even if she had recognized James in the video, because she did not want anything to happen to him. Gallegos testified to that effect in both trials, after the court overruled James's objection that the questioning called for speculation.

We review the trial court's ruling on a speculation objection for abuse of discretion. (*People v. Marlow* (2004) 34 Cal.4th 131, 152.) To prevail, the defendant must show that the court "exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

The courts did not abuse their discretion here. Gallegos and James had a child together; she said that she was worried about him, she cared about him, and she did not

34

want anything bad to happen to him. Her state of mind was a matter within her personal knowledge. Given her knowledge of her own state of mind, her testimony about her probable actions in the event that she recognized James was not speculative. That knowledge gave her a basis for determining how she would act.

James's argument to the contrary is unpersuasive. He argues that asking a witness what they would do in "counterfactual circumstances" calls for improper speculation. But the argument is based on a flawed premise, namely, that Gallegos recognizing James was a counterfactual circumstance. The evidence on that point was conflicting. Although Gallegos told the officers that the man in the video was not James, and she testified that she did not recognize anyone in the video, her recorded phone calls with James showed otherwise. She told him that the officers had surveillance video of him and that the man looked just like him. If her statements in the recorded calls were credited, it was not counterfactual at all to say that she recognized James, and the People's questioning on the topic was proper.

With respect to James's federal constitutional claim, the trial court's "'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010 (*Hovarter*); *People v. Rogers* (2013) 57 Cal.4th 296, 332 [evidence that was "material, probative, and [properly] admitted" did not violate the defendant's due process right to a fair trial].) Moreover, a claimed error does not violate the defendant's constitutional right to due process unless it renders the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 436, 439.) James contends that the challenged testimony destroyed the exculpatory force of

35

Gallegos's other testimony that he was not the suspect in the video, thereby rendering his trial fundamentally unfair. But the "category of infractions that violate 'fundamental fairness'" has been defined "very narrowly." (*Dowling v. United States* (1990) 493 U.S. 342, 352.) It is "rare and unusual" for the admission of evidence to render a trial fundamentally unfair. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 232.) James has not shown that this is one of those rare cases. He cites no authority showing that relevant and admissible evidence renders a trial fundamentally unfair merely because it tends to establish the defendant's guilt.

For these reasons, the courts did not abuse their discretion or violate James's constitutional right to due process by overruling the speculation objection to Gallegos's testimony.

IV. *Evidence of Prior Shootings*

James contends that the court prejudicially erred by admitting evidence of the Santa Ana, Vermont Street, and Twelfth Street shootings in the first trial. Likewise, he contends that the court in the second trial prejudicially erred by admitting evidence of the Santa Ana and Vermont Street shootings. The arguments lack merit. Even assuming that the court erred in both cases, the errors were not prejudicial. We also reject James's claim that the errors violated his federal constitutional right to due process.

A. *Relevant Background*

During the first trial, James moved to exclude evidence of all three prior shootings. He argued that the prior shootings amounted to improper character evidence under Evidence Code section 1101 and that the court should exclude the evidence under

36

Evidence Code section 352. The People moved to admit evidence of all three prior shootings, arguing that the uncharged acts were relevant to prove James's identity; the means and opportunity to commit the charged offenses; and his intent to kill, premeditation, and deliberation. The People's offer of proof summarized the same material evidence of each shooting that they offered at trial.

The court ruled that the Twelfth Street shooting was relevant to prove James's intent to kill. The court noted that it had analyzed the issue under Evidence Code section 352 and concluded that the probative value of the evidence was not outweighed by any prejudice. The court also ruled that the Santa Ana and Vermont Street shootings were admissible to prove identity and the firearm possession charge. Consistent with those rulings, the court instructed the jurors that they could consider the Twelfth Street shooting for the limited purpose of deciding whether James acted with intent to kill in this case. (CALCRIM No. 375.) The court also instructed the jurors that they could consider the Santa Ana and Vermont Street shootings for the limited purposes of deciding identity (i.e., whether James was the person who committed the charged offenses) and the intent and knowledge elements of the possession charge (i.e., whether James acted with intent to possess and knew that he possessed a firearm). (*Ibid.*)

During the second trial, James moved the court to reconsider the rulings admitting evidence of the three prior shootings in the first trial. The People again moved to admit the evidence, arguing the same theories of relevancy. Again, the People's offer of proof summarized the same material evidence of the shootings that they offered at trial.

37

The court admitted the Santa Ana and Vermont Street shootings to prove identity only. The court indicated that it had analyzed the evidence of the first two shootings under Evidence Code section 352, and it was "not too prejudicial." But the court excluded the Twelfth Street shooting for all purposes. It concluded that the evidence was insufficient for the jury to find by a preponderance of the evidence that James committed that shooting. For that reason, the court also concluded that the evidence was more prejudicial than probative under Evidence Code section 352. The court instructed the jurors that they could consider the Santa Ana and Vermont Street shootings for the limited purpose of deciding whether James was the person who committed the charged offenses. (CALCRIM No. 375.)

B. *Analysis*

Subdivision (a) of Evidence Code section 1101 prohibits the admission of character or propensity evidence. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) However, subdivision (b) of the same statute creates an exception for "evidence that a person committed a crime, civil wrong, or other act when relevant to prove . . . motive, opportunity, intent, preparation, plan, knowledge, identity," or some fact other than character or disposition to commit the act. (Evid. Code, § 1101, subd. (b); *Ewoldt*, *supra*, at p. 393.)

When the relevance of the uncharged act depends on the defendant's identity as the perpetrator, the trial court must conclude that the evidence is sufficient for the jury to find by a preponderance of the evidence that the defendant committed the uncharged act. (Evid. Code, § 403, subd. (a)(1), (4); *People v. Leon* (2015) 61 Cal.4th 569, 599 (*Leon*);

*People v. Cottone* (2013) 57 Cal.4th 269, 286, fn. 10; *People v. Bacon* (2010) 50 Cal.4th 1082, 1102 (*Bacon*).) The existence of that preliminary fact is "'not finally decided'" by the trial court (*People v. Lucas* (1995) 12 Cal.4th 415, 466), and the court does not resolve conflicts in the evidence submitted on the preliminary fact question (*Bacon*, *supra*, at p. 1103). "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.'" (*Lucas*, *supra*, at p. 466.)

There are other requirements for admissibility, beyond the preliminary factual showing that the defendant committed the uncharged act. "[T]here must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented." (*People v. Jones* (2011) 51 Cal.4th 346, 371 (*Jones*).) Moreover, even if the uncharged and charged acts are sufficiently similar, the court must consider whether evidence of the uncharged act should be excluded under Evidence Code section 352. (*Leon*, *supra*, 61 Cal.4th at pp. 597-598.) "Specifically, the uncharged act . . . must not be unduly prejudicial, confusing, or time consuming." (*Id*. at pp. 597-598; *id*. at p. 599.)

We review the trial court's ruling admitting evidence of uncharged acts for abuse of discretion. (*Leon*, *supra*, 61 Cal.4th at p. 597.) That includes the court's decision on whether the evidence is sufficient to sustain a finding that the defendant committed the uncharged act. (*Bacon*, *supra*, 50 Cal.4th at p. 1103.)

James argues that the courts abused their discretion in both trials because (1) the evidence that he committed the uncharged shootings was insufficient, (2) the Santa Ana

and Vermont Street shootings were not similar enough to the charged acts to be relevant on identity, and (3) any probative value of the uncharged acts was outweighed by the risk of undue prejudice under Evidence Code section 352.

Assuming for the sake of argument that the trial courts erred by admitting evidence of all three prior shootings, any error was not prejudicial. That is, it is not reasonably probable that James would have obtained a more favorable result if the courts had excluded the evidence. (*Jones*, *supra*, 51 Cal.4th at p. 372.) First, to the extent that both trial courts admitted the Santa Ana and Vermont Street shootings on identity, the record contains plenty of other evidence establishing James's identity as the person who shot Ramirez. Law enforcement showed Gallegos the surveillance video of the shooting. After seeing it, she told James that officers had video of him and that the video looked just like him. Although she told the officers that it was not him and testified similarly, the credibility of those statements was undermined by the evidence of her relationship with James and her feelings for him, as well as her testimony that she would not have identified him even if she had recognized him. In addition, the shooting occurred at around 9:33 p.m., and at 9:46 p.m., James's cell phone connected to a tower that provided coverage at the crime scene and the surrounding area. And James's recorded conversations with Gallegos and others showed consciousness of guilt. For instance, James asked Smith, a fellow gang member, about getting a false ID after learning about Gallegos's interview with law enforcement, and James indicated that he was thinking about fleeing. Smith reassured James that while someone was "snitch[ing]" or had "loose lips," law enforcement had nothing "concrete." James indicated that he was still thinking

40

about fleeing. Eddington and James also discussed that someone was "singing" or "bumping their gums," and they discussed how only someone in their circle could "point a finger." Eddington advised James to have his alibi ready, and James urged Eddington several times to get rid of his car. James asked Gallegos whether she could see "tattoos on the eyes" in the video of the shooter, knowing that he has tattoos under his eyes. When the video became available on social media, James and Eddington also discussed whether "marks" on the shooter's eyes were visible, and Eddington assured him the video was too blurry to see anything.

The recorded calls as a whole show that James was concerned that he could be identified in the video, he was worried that someone with knowledge of his involvement in the shooting was talking to law enforcement, and he was considering fleeing and wanted Eddington to destroy evidence by getting rid of Eddington's car. Those calls, including Gallegos's statements identifying James, and the cell phone evidence constitute ample evidence establishing James's identity independent of the uncharged acts. Consequently, it is not reasonably probable that James would have obtained a more favorable result if the evidence of the uncharged acts had been excluded. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26 (*Lindberg*) [assumed error in admitting evidence of uncharged offenses on intent was harmless because of other compelling evidence establishing the defendant's intent]; *People v. Carter* (2005) 36 Cal.4th 1114, 1152 ["[i]n view of the strong evidence implicating defendant in the charged murders . . . , it is not reasonably probable that an outcome more favorable to defendant would have been reached in the absence" of the uncharged acts evidence].)

41

Second, to the extent that the court in the first trial admitted the Twelfth Street shooting on intent to kill, the record otherwise contains powerful evidence establishing James's intent to kill Ramirez. The surveillance video shows a man shooting Ramirez point blank in the head with no evident legal excuse. (*People v. Smith* (2005) 37 Cal.4th 733, 742 ["the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice"].) Nor was there any other evidence of a legal excuse to shoot Ramirez. Thus, once the jury concluded that James was the shooter in the video, there was little doubt that he intended to kill Ramirez, even without evidence of the Twelfth Street shooting.

Third, for similar reasons, any error in admitting the Santa Ana and Vermont Street shootings on the general intent and knowledge elements of the firearm offense was harmless: Once the jury concluded that James was the shooter in the video, there was little doubt that he acted with intent to possess the gun used in the shooting and knew that he possessed it, even without evidence of the uncharged shootings.

Fourth, the jury instructions minimized any improper effect the evidence would have had on the jury. The courts properly instructed the jurors that (1) they could consider evidence of the uncharged acts only if the People had proved by a preponderance of the evidence that James "in fact committed" the uncharged acts, and (2) if the People had not carried that burden, the jurors had to disregard the evidence entirely. (CALCRIM No. 375.) The courts also instructed the jurors on the limited purpose of the evidence and told them that they could not consider the evidence for any other purpose.

42

(*Ibid.*) Finally, the courts instructed the jurors that they could not conclude from the evidence that James "has a bad character or is disposed to commit crime." (*Ibid.*) We presume the jurors followed those instructions. (*Lindberg*, *supra*, 45 Cal.4th at p. 26.) Accordingly, if the evidence was insufficient to show that James committed the uncharged acts, the jurors would not have considered the evidence. (See *People v. Simon* (1986) 184 Cal.App.3d 125, 130, fn. 3 ["clearly if the defendant cannot be connected to the prior act, admission of evidence concerning it will not normally prejudice him"].) Similarly, notwithstanding James's contrary argument, the jurors would not have concluded from the evidence that he was predisposed to commit shootings or that he acted with intent to kill and premeditation in the second trial. The courts instructed the jurors not to use the evidence for those purposes. (See *Jones*, *supra*, 51 Cal.4th at p. 372 [evidence of uncharged robbery "was not particularly prejudicial, especially given the limiting instruction the court gave the jury"].)

Fifth, we are not persuaded by James's contention that the prosecutor's closing argument in the second trial contributed to any prejudice. The prosecutor discussed the Santa Ana and Vermont Street shootings for only two pages of his 20-page closing argument. He briefly mentioned the shootings in two sentences of his seven-page rebuttal argument. The uncharged shootings were far from a centerpiece of his argument. Indeed, the bulk of his argument on identity focused on the recorded calls and other evidence establishing James's identity. And again, that evidence was strong.

Lastly, the evidence of the uncharged shootings was not especially inflammatory when compared to the evidence of the charged offenses. (*Jones*, *supra*, 51 Cal.4th at

43

pp. 371-372 [uncharged act was not particularly inflammatory compared to the facts of the charged crimes, supporting the conclusion that the evidence was not unduly prejudicial under Evid. Code, § 352 and that any erroneous admission was harmless].) There was no evidence before the jury that anyone died or was even injured in connection with the Santa Ana and Vermont Street shootings. And even though the jury knew that the victim of the Twelfth Street shooting died, the brief testimony regarding the victim's death was nowhere near as shocking as the surveillance video depicting the shootings of Ramirez, Bartolo, and Domingo.

As for James's federal due process claim, he argues that because admission of the evidence prejudiced him, his trials necessarily were fundamentally unfair. But for the reasons just given, there was no prejudice from any assumed error. Because James offers no further "elaboration or separate argument," his constitutional claim fails. (*Hovarter*, *supra*, 44 Cal.4th at p. 1010.)

For all of these reasons, we conclude that the trial courts did not prejudicially err or violate James's right to due process by admitting evidence of uncharged acts.

V. *Assembly Bill 333*

The parties agree that Assembly Bill 333 requires us to reverse or vacate James's conviction for active participation in a criminal street gang, the true findings on the gang enhancements, and the true findings on the firearm enhancements that incorporate provisions of section 186.22. (§§ 186.22, subds. (a), (b)(1)(C), 12022.53, subd. (e)(1).) We concur with the parties.

Assembly Bill 333 made numerous changes to section 186.22 that took effect after James's trials. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477 (*E.H.*).) The judgment in this case is not final, so the amendments apply here. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)

Assembly Bill 333 made the following changes to section 186.22: "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal [gang] activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*Tran*, *supra*, 13 Cal.5th at p. 1206.)

45

Those new definitions of "criminal street gang," "pattern of criminal gang activity," and "common benefit" added elements to the substantive gang offense and the gang enhancement that did not exist at the time of James's trials. (§ 186.22, subds. (a), (b)(1), (e)(1), (2), (f), (g); *E.H.*, *supra*, 75 Cal.App.5th at p. 479.) The People thus were not required to prove those additional elements, and the court did not instruct the jury on them. We must reverse "unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran*, *supra*, 13 Cal.5th at p. 1207.)

We cannot conclude that the failure to require proof of the new elements was harmless beyond a reasonable doubt. For instance, Riedeman testified at both trials about predicate offenses committed by 1200 Blocc Crips members, the latest one occurring on October 21, 2012. The charged offenses occurred on October 23, 2015. The last predicate offense therefore fell just outside the three-year period for offenses used to establish a "'pattern of criminal gang activity.'" (§ 186.22, subd. (e)(1).) Moreover, although the evidence showed that in the predicate cases a gang enhancement had also been found true, there was no evidence that the benefit from the predicate offenses was "more than reputational." (§ 186.22, subd. (e)(1).) Because of those deficiencies in the evidence, the failure to require proof of the new elements was not harmless.

"The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges" and enhancement allegations. (*E.H.*, *supra*, 75 Cal.App.5th at p. 480.) James argues that remand for retrial would be an idle act because Riedeman

46

conceded that he was unable to locate any other predicate offenses, but the argument lacks merit. At the first trial, before Riedeman testified about each of the predicate offenses, the People showed him the conviction packets for the offenses and asked: "And are these predicate offenses that you were able to find for the 1200 Blocc Crips?" He replied: "Yes." James's concludes from that testimony that there were no other qualifying predicate offenses. That inference is not reasonable. The People were not required to present evidence of every possible predicate offense, and they had no notice that they needed to offer evidence of a more recent one to establish a pattern of criminal activity. On remand, if the People cannot find evidence of a more recent predicate offense, then they may elect not to retry James on the affected offense and enhancements. But they are entitled to the opportunity. (*E.H.*, at p. 480.) We therefore vacate James's conviction under section 186.22, subdivision (a), and the true findings under section 186.22, subdivision (b)(1)(C), and remand for further proceedings.

The firearm enhancements associated with the two murder counts are also affected, because the enhancement statute expressly incorporates section 186.22. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346, 348 (*Lopez*).) "Section 12022.53 provides for sentence enhancements for the use of firearms in the commission of an enumerated felony." (*Id.* at p. 347.) As relevant here, subdivision (d) of the statute adds a 25-year-to-life enhancement for a person who "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death" during the commission of an enumerated offense. (§ 12022.53, subd. (a).) Subdivision (e)(1) of the statute "imposes vicarious liability" on someone who aids and abets the enumerated offense

47

under gang-related circumstances. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171.) Specifically, the court may impose the 25-year-to-life enhancement on any principal who "violated subdivision (b) of section 186.22," so long as some principal in the offense personally used a firearm as defined in subdivision (d). (§ 12022.53, subd. (e)(1)(A), (B).) Accordingly, imposition of the vicarious firearm enhancement requires proof of the new elements of the gang enhancement (§ 186.22, subd. (b)(1)). (*Lopez, supra*, at pp. 347-348.)

The jurors found that James was "a principal" in the murders of Bartolo and Domingo and that "someone who was a principal" in the murders "personally and intentionally discharged a firearm and proximately caused great bodily injury or death." They separately found true the gang enhancement allegations associated with each murder count. The court thus imposed the vicarious firearm enhancement under section 12022.53, subdivision (e)(1), in connection with each murder count. Assembly Bill 333's changes to section 186.22 require us to vacate those firearm enhancements as well. (*Lopez, supra*, 73 Cal.App.5th at pp. 347-348.)

James argues that we should also vacate the firearm enhancement associated with the attempted murder count, but we disagree. The jurors did not find James vicariously liable for that firearm enhancement. The court properly instructed them on the personal use enhancement in section 12022.53, subdivision (d). (CALCRIM No. 3149.) The jurors found that in the commission of the attempted murder, James "personally and intentionally discharge[d] a firearm and proximately caused great bodily injury or death to another person, not an accomplice, within the meaning of [section] 12022.53,

48

subdivision (d)." That subdivision does not incorporate section 186.22, so Assembly Bill 333 provides no reason to vacate the jury's finding.**5** (*Lopez*, *supra*, 73 Cal.App.5th at p. 348.) The verdict form also cited subdivision (e) of section 12022.53, but the jurors made no vicarious liability findings, in contrast to their findings on the verdict form for the other firearm enhancements. We may disregard any technical or clerical error in citing subdivision (e), given that the jury clearly intended to find James liable for personally using a firearm under subdivision (d). (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272-1273.)

In sum, Assembly Bill 333 requires us to vacate James's conviction under section 186.22, subdivision (a), the gang enhancements under section 186.22, subdivision (b)(1)(C), and the vicarious firearm enhancements under section 12022.53, subdivision (e)(1). On remand, the People shall have the opportunity to retry that offense and those enhancements.

---

**5** James also argues that we should vacate the personal use firearm enhancement for reasons unrelated to Assembly Bill 333. He claims that the People pled only the vicarious firearm enhancement in the attempted murder count, so he did not have fair notice that he faced the personal use firearm enhancement. James has forfeited the argument. Assuming for the sake of argument that the information did not plead the personal use enhancement, James had fair notice that he was facing that enhancement when the hearings on jury instructions and verdict forms occurred. The People explained that in connection with the attempted murder count, they were alleging that James had personally used a firearm under subdivision (d) of section 12022.53. When the court asked about giving the pattern jury instruction on that enhancement (CALCRIM No. 3149), defense counsel answered: "No objection." Similarly, when discussing the verdict form for that enhancement, the People explained that they had drafted the form to reflect liability under section 12022.53, subdivision (d), as opposed to subdivision (e). James did not object. His failure to raise an objection at that point forfeited the claim. (*People v. Houston* (2012) 54 Cal.4th 1186, 1227-1228.)

49

VI. *Substantial Evidence of the Gang's Primary Activities*

James argues that there was not substantial evidence in the second trial to establish the primary activities element of the gang enhancement. Consequently, he argues that we must vacate the gang and vicarious firearm enhancements attached to his murder convictions. If James is correct that the evidence is insufficient even under the former version of section 186.22, then double jeopardy principles would prohibit retrial of the enhancements. (*People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033; *People v. Sek* (2022) 74 Cal.App.5th 657, 669 (*Sek*).) We conclude, however, that James's argument lacks merit.

Section 186.22 provides for enhanced punishment when the defendant commits an enumerated felony "for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1).) To qualify as a criminal street gang, an organization's "primary activities" must include committing one or more of the crimes specified in section 186.22, subdivision (e). (§ 186.22, subd. (f).) Although numerous offenses qualify as primary activities, the court here instructed the jury on only four qualifying offenses—burglary (§ 459), assault with a firearm (§ 245, subd. (a)(2)), sales of narcotics (Health & Saf. Code, § 11378), and robbery (§ 211). (§ 186.22, subd. (e)(1)(A), (B), (D), (K).) The People may prove a gang's primary activities through expert testimony. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 (*Duran*).)

On this record, there was substantial evidence establishing the primary activities element of the gang enhancement. Sales of narcotics qualify as a primary activity of a

criminal street gang, and the jury was so instructed. Riedeman testified that the primary activities of the 1200 Blocc Crips included sales of narcotics. And his testimony about his experience provided an adequate foundation for his opinion: The gang unit investigated all of the gangs in Riverside, which included the 1200 Blocc Crips. Riedeman first became familiar with the 1200 Blocc Crips when he worked their territory as a patrol officer. He started talking with gang members while in the patrol unit. Once he became a detective in the gang unit, he learned information from his own sources and investigations but also by sharing intelligence with every other gang detective. The patrol officers sent the gang unit reports of every crime that the patrol officers believed was gang related. Riedeman reviewed those reports and helped determined whether to pursue gang charges or enhancements in those cases. All of that was the type of information on which gang experts may reasonably rely in forming their opinions. (*People v. Gardeley* (1996) 14 Cal.4th 605, 620, disapproved on other grounds by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; *Duran*, *supra*, 97 Cal.App.4th at p. 1465.)

James acknowledges that the People may rely on expert testimony to prove a gang's primary activities. But he argues that Riedeman was testifying as a lay witness— not an expert—because when the prosecutor asked Riedeman what the gang's primary activities were, Riedeman responded: "Just based on what I saw[,] was drugs, possession of firearms, violent assaults." James asserts that what a witness "personally saw" is lay testimony.

That prefatory phrase did not transform Riedeman's testimony into lay opinion. Lay opinion must be "based on the perception of the witness" (Evid. Code, § 800), but an

expert witness's opinion may also be "[b]ased on matter . . . perceived by or personally known to the witness" (Evid. Code, § 801, subd. (b)). Consequently, the fact that Riedeman personally perceived some or all of the information on which he based his opinion did not automatically render his testimony lay opinion.

For these reasons, substantial evidence established that the gang's primary activities consisted of one or more qualifying offenses.

## VII. *Great Bodily Injury Enhancement*

The parties agree that the court erred by failing to stay James's sentence on the great bodily injury enhancement. We concur. In connection with the attempted murder count, the court imposed a consecutive three-year term under section 12022.7 for personally inflicting great bodily injury. The court also imposed punishment under section 12022.53, subdivision (d), for personally using a firearm. But "[a]n enhancement for great bodily injury as defined in Section 12022.7 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)" of section 12022.53. (§ 12022.53, subd. (f).) Accordingly, we direct the trial court to stay the three-year prison term imposed under section 12022.7. (*People v. Garcia* (2017) 7 Cal.App.5th 941, 948-949.)

## VIII. *Amendment to Section 654*

Under section 654, the court stayed James's sentence on his convictions for active participation in a criminal street gang and possession of a firearm by a felon. James argues that we should remand for the trial court to exercise its discretion under amended section 654. Former section 654 provided that an act punishable by more than one

provision of the law "shall be punished under the provision that provides for the longest potential term of imprisonment" but could not be punished under more than one provision. (Former § 654, subd. (a).) Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518) removed the requirement that the court impose the longest term. (*Sek*, *supra*, 74 Cal.App.5th at p. 673.) Thus, effective January 1, 2022, section 654 permits a defendant whose single act is punishable by multiple provisions to "be punished under either of such provisions." (§ 654, subd. (a).)

The People concede that Assembly Bill 518 applies retroactively to the nonfinal judgment in this case, and we agree. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) But they argue that a remand for the court to exercise its discretion would be an idle act. In light of our remand for further proceedings on the gang conviction and the gang enhancements, we need not resolve the parties' dispute over whether remand is independently necessary on the section 654 issue. On remand, James may ask the court to exercise its discretion under amended section 654.

## DISPOSITION

We vacate James's conviction for active participation in a criminal street gang (§ 186.22, subd. (a)), the true findings on the gang enhancements (§ 186.22, subd. (b)(1)(C)) attached to the murder and attempted murder counts, and the true findings on the firearm enhancements (§ 12022.53, subd. (e)(1)) attached to the murder counts. We remand to the trial court to (1) give the People the opportunity to retry the offense and enhancements under the new law as amended by Assembly Bill 333, or (2) impose appropriate dispositions should the People choose not to proceed with retrial. In addition,

53

on remand, the trial court is directed to stay execution of the three-year enhancement imposed under section 12022.7, subdivision (a).  The court may also exercise its discretion under section 654 as amended by Assembly Bill 518.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

RAMIREZ

P. J.

RAPHAEL

J.